**In re NATIONAL MORTGAGE EQUITY CORPORATION MORTGAGE POOL CERTIFICATES SECURITIES LITIGATION.**

**No. MDL 647 AWT.**

United States District Court,
C.D. California.

Sept. 25, 1987.

Alan D. Bersin, Jeffrey I. Weinberger, Anne H. Egerton, Michael E. Soloff, Susan E. Nash, Munger, Tolles & Olsen, Los Angeles, Cal., for Bank of America NT & SA.

Arthur J. Shartsis, Mary Jo Shartsis, Charles R. Rice, Tracy L. Salisbury, Shartsis, Friese & Ginsburg, San Francisco, Cal., for Riverhead Sav. Bank, First Federal Sav. & Loan Ass'n, Missouri Sav. Ass'n.

Joseph C. Lepanto, Mesirov, Gelman, Jaffe, Cramer & Jamieson, Philadelphia, Pa., for First Federal Sav. & Loan Ass'n.

Gideon H. Schiller, Portman, Bernhardt, Kessler & Black, St. Louis, Mo., for Missouri Sav. Ass'n.

Harvey Besunder, Cruser, Hills, Hills & Besunder, Riverhead, N.Y., for Riverhead Sav. Bank, F.S.B.

Charles C. Wehner, Rodney M. Perlman, Robert F. Hinton, Karen A. Rooney, Wehner & Perlman, Los Angeles, Cal., for Nat. Mortg. Equity Corp., David Feldman.

John A. Donovan, James E. Lyons, Floran L. Fink, Skadden, Arps, Slate, Meagher & Flom, Los Angeles, Cal., for Lord, Bissell & Brook; Leslie W. Michael.

George H. Link, Gregg A. Farley, Brobeck, Phleger & Harrison, Los Angeles, Cal., William E. Trautman, Robert P. Varian, Brobeck, Phleger & Harrison, San

Francisco, Cal., for Wells Fargo Bank, William Van Zile.

Alexander L. Brainerd, Richard A. Ardoin, Bronson, Bronson & McKinnon, San Francisco, Cal., for Mebac.

Charles Jarvis Murray, San Francisco, Cal., for West–Pac Corp., Kent B. Rogers.

Kurt W. Melchior, Mark Joseph Kenney, Severson, Werson, Berke & Melchior, San Francisco, Cal., for Lomas and Nettleton Co.

Martin H. Kresse, Robert J. Yorio, Barbara Cray, McKenna, Conner & Cuneo, San Francisco, Cal., for Umpqua Sav. & Loan Assn.

Randall L. Hite, Santa Ana, Cal., for Energy Resources, Inc., Marvin H. Weiss.

Floyd Anglin, in pro. per.

Styn & Garland, San Diego, Cal., for American Title Ins.

William V. McTaggart, Jr., Parker, Milliken, Clark O'Hara & Samuelian, Los Angeles, Cal., for Glacier Gen. Assur. Co.

Randall H. Gray, James, Gray & McCafferty, Great Falls, Mont., for Andrea Bennett, Liquidator of Glacier Gen. Assur. Co.

## MEMORANDUM OPINION AND ORDER

TASHIMA, District Judge.

### PRELIMINARY STATEMENT

Before the Court in this multidistrict litigation are several defendants' motions to dismiss the First Amended Complaints of Riverhead Savings Bank ("Riverhead"), Missouri Savings Association ("Missouri") and First Federal Savings and Loan Association ("First Federal") (collectively the "Savings Banks") and the Second Amended Complaint of Bank of America ("B of A" or the "Bank").

The Savings Banks' First Amended Complaints differ significantly from B of A's Second Amended Complaint. Consequently, this memorandum opinion consists of two parts. *PART ONE* addresses the motions to dismiss the Savings Banks' First Amended Complaints. *PART TWO* addresses the motions to dismiss B of A's Second Amended Complaint.

This is the second wave of motions to dismiss in these actions. The factual allegations concerning the formation and marketing of the pools and the fraud are set forth in ample detail in the Court's Memorandum Opinion and Order on the first set of motions to dismiss and will only be supplemented here where necessary. *See In re National Mortgage Equity Corp. Mortgage Pool Certificates Sec. Litig.*, 636 F.Supp. 1138 (C.D.Cal.1986) (*"NMEC"*).

### *PART ONE:* THE SAVINGS BANKS' FIRST AMENDED COMPLAINTS

### PROCEDURAL BACKGROUND

On the prior round of the various motions to dismiss the Savings Banks' original complaints, which were granted in part and denied in part, the Court granted leave to amend on all of the dismissed claims, except for Missouri's First Claim with respect to the Series "A" Certificate. That claim was held to be barred by the statute of limitations. *NMEC*, 636 F.Supp. at 1167, 1173.

The Savings Banks' First Amended Complaints address the deficiencies found on the first round of motions to dismiss, add claims for breach of contract, breach of duty and negligence against Wells Fargo Bank ("Wells Fargo") and add Manufacturers Hanover Trust Company of California ("Manufacturers Hanover") as a defendant. Riverhead also added Advance Mortgage Corporation and its successor-in-interest, the Lomas & Nettleton Company (collectively "Advance"), as defendants, asserting claims for breach of contract and negligence against it. Advance had already been named as a defendant on similar claims by First Federal and Missouri in their original complaints.

Before the Court are motions to dismiss the Savings Banks' First Amended Complaints by defendants National Mortgage Equity Corporation ("NMEC"), David A. Feldman ("Feldman"), Advance, Manufacturers Hanover, Leslie W. Michael ("Michael"), and Lord Bissell & Brook, the part-

ners of Lord Bissell & Brook and Kay Aevermann (collectively "Lord Bissell"). Defendants advance a wide array of grounds in support of their motions. These are discussed below.

## DISCUSSION

### I. STATUTE OF LIMITATIONS

#### A. *Section 12(1) Claims*

The Savings Banks allege violations of § 12(1) of the Securities Act of 1933, (the "1933 Act"), 15 U.S.C. § 77*l* (1), which imposes liability on those who offer to sell or sell unregistered securities in violation of § 5 of the 1933 Act, 15 U.S.C. § 77e.[1] Defendants contend that First Federal and Missouri's § 12(1) claims are barred by the limitations period of § 13 of the 1933 Act, 15 U.S.C. § 77m.[2]

Section 13 requires a § 12(1) action to be brought within one year after the violation of § 5 and "in no event ... more than three years after the security was bona fide offered to the public."[3] The statute begins to run from the date of defendant's last sales-related activity, *i.e.*, offer, sale or delivery of the security. *NMEC*, 636 F.Supp. at 1166.

Here, First Federal purchased its Series "B" pool Certificate on March 23, 1982, while Missouri purchased its Series "A" pool Certificate on January 29, 1982, and its Series "D" pool Certificate on July 15, 1982. First Federal filed its complaint on March 22, 1985. Missouri filed its complaint on April 18, 1985.[4] Since these dates are more than one year after the last sales-

related activity alleged, First Federal and Missouri's § 12(1) claims are time-barred, unless they can be saved by the doctrine of fraudulent concealment.

The Court held on the first round of motions to dismiss that § 13's one-year limitation on § 12(1) actions can be equitably tolled by fraudulent concealment. *Id.* at 1167. Proper allegations of fraudulent concealment state "facts showing affirmative conduct upon the part of the defendant which would, under the circumstances of the case, lead a reasonable person to believe that he did not have a claim for relief," and also state "facts showing [plaintiff's] due diligence in trying to uncover the facts." *Rutledge v. Boston Woven Hose & Rubber Co.*, 576 F.2d 248, 250 (9th Cir. 1978).

The Court held that First Federal and Missouri failed adequately to plead fraudulent concealment in their original complaints. *NMEC*, 636 F.Supp. at 1167. "To invoke the doctrine ... [plaintiffs] must *plead with particularity* the facts giving rise to the fraudulent concealment claim and must establish that they used due diligence in trying to uncover the facts." *Volk v. D.A. Davidson & Co.*, 816 F.2d 1406, 1415–16 (9th Cir.1987) (emphasis added). In dismissing First Federal and Missouri's claims, the Court stated that they "must plead with at least some particularity *why* they did not know the securities should have been registered, *when* they first discovered registration was required, *what* circumstances or events led to

---

**1.** NMEC contends that the mortgage-backed certificates in this case are not governed by the securities laws because they are participation interests in loan pools that are governed exclusively by regulations promulgated by the Federal Home Loan Bank Board. NMEC's argument does not appear to have merit. However, the Court has already ruled that whether the certificates are "securities" is not an issue susceptible of determination on a motion to dismiss in these cases. *NMEC*, 636 F.Supp. at 1164.

**2.** On the first round of motions to dismiss, the Court held that Riverhead's §§ 12(1), 12(2) and state securities laws claims, based on the Series "C" Certificate it purchased in April, 1984, from Umpqua Savings and Loan Association ("Umpqua") through its broker MEBAC, were timely. *NMEC.* 636 F.Supp. at 1166–70.

**3.** It is plaintiffs' burden affirmatively to plead facts showing compliance with § 13's limitations periods. *Toombs v. Leone*, 777 F.2d 465, 468 (9th Cir.1985). Moreover, the one-year and three-year periods are cumulative, not alternative, *i.e.*, plaintiff must demonstrate compliance with both periods. *Morley v. Cohen*, 610 F.Supp. 798, 815 (D.Md.1985).

**4.** The earlier Memorandum Opinion mistakenly states that both First Federal and Missouri's complaints were filed on March 22, 1985. *NMEC*, 636 F.Supp. at 1166. This error, however, does not affect the analysis set forth therein.

that discovery and *why* they did not discover those facts earlier." *NMEC*, 636 F.Supp. at 1167 (emphasis in original). The Court concludes that First Federal and Missouri's First Amended Complaints fail to meet this standard.

First Federal and Missouri allege that defendants affirmatively represented that the certificates were exempt from registration and that all information necessary to enable them to make an investment decision had been provided. Amend.Comps. ¶¶ 56, 59. Plaintiffs allege that they believed that the certificates were exempt from registration under § 4(2) of the 1933 Act, 15 U.S.C. § 77d(2), which exempts transactions "not involving a public offering" from the registration requirements of § 5. They argue that they had no reason to believe that the certificates were not entitled to the private placement exemption because they closely resembled government guaranteed mortgage-backed certificates, which are exempt from registration. They allege that they had no reason to believe that the sale of the certificates was part of an overall scheme that constituted an integrated, nonexempt public offering until January, 1985, when they finally received a copy of Advance's letter of December, 1982, in which it resigned as the servicer of the pools and outlined a number of irregularities in the pools. It was at this point, they allege, that they discovered that they and a number of other investors had been defrauded.

Putting aside the incredibleness of their explanation of why they did not know the securities should have been registered at the time, First Federal and Missouri *still* fail to plead with particularity *why* they did not discover those facts earlier, *i.e.*, facts showing their due diligence.

First Federal and Missouri argue that paragraphs 44–53 of their First Amended Complaints contain sufficient allegations of due diligence. Yet these sections only allege why they believed they had no reason to conduct an independent investigation of Advance's resignation. They provide *no* explanation of why they failed to discover sooner that the offer and sale of these mortgage-backed certificates constituted an integrated public offering. First Federal and Missouri admit that they knew at least as early as May, 1983,[5] that NMEC was "servicing numerous newly formed pools." Amend.Comps. ¶ 47. Given this knowledge, First Federal and Missouri had at least inquiry notice suggesting the integration problem, yet they do not allege any efforts to discover whether their pools were part of an integrated offering. Thus, they have failed to meet their burden of particularly pleading equitable tolling of their § 12(1) claims. Those claims are now dismissed.[6]

### B. *Section 12(2) and State Securities Law Claims*

Claims brought under § 12(2) of the 1933 Act, 15 U.S.C. § 77*l* (2), also are governed by § 13's limitations period, *i.e.*, they must be brought "within one year after the discovery of the untrue statement, or after such discovery should have been made by the exercise of reasonable diligence," and "in no event ... more than three years after the sale." The applicable statute of limitations for the state securities law claims embodies the same standard applied to § 12(2) claims. *See* Cal.Corp.Code § 25506; *NMEC*, 636 F.Supp. at 1170.

On the previous motions to dismiss, the Court dismissed First Federal and Missouri's § 12(2) and state securities law claims,[7] finding that although their allega-

---

**5.** This was when they received a letter from Wells Fargo announcing Advance's resignation as servicer of the pools and NMEC's appointment as Advance's replacement.

**6.** Advance also contends that the § 12 claims against it must fail because it was not a "seller" within the meaning of that statute. In light of the disposition of the statute of limitations issue, it is unnecessary to reach this issue.

**7.** Because the California statute provides a four-year period, rather than the three-year period of § 13, Missouri's state securities law claim based on its Series "A" Certificate was not absolutely barred. However, the Court concluded that Missouri had failed to allege due diligence in discovering this claim and thus dismissed it together with Missouri's claim based on the Series "D" Certificate.

tions of fraudulent concealment were sufficient, they failed to plead facts showing their due diligence. *Id.* at 1169. The Court noted that:

> the complaints ... state that Advance resigned as servicer in March 1983. While the complaints intimate that Wells Fargo pressured plaintiffs into approving the substitution of NMEC as servicer, plaintiffs do not allege what steps, if any, they took to investigate the circumstances surrounding Advance's resignation. It may be that reasonable inquiry would have revealed facts putting plaintiffs on notice of the fraud.

*Id.* First Federal and Missouri admit in their Amended Complaints that they made *no* "independent investigation of the facts and circumstances surrounding Advance's resignation and NMEC's appointment as servicer...." Amend.Comps. ¶ 47. Instead, they allege why they had no reason to suspect wrongdoing by defendants and why they were entitled to rely on Wells Fargo's investigation of the resignation and its assurances that there were no problems. Amend.Comps. ¶¶ 44–53.

As the Court previously stated, the investigation that *others* undertook is irrelevant to the issue of "what due diligence *the Savings Banks* undertook to uncover their claim." *NMEC*, 636 F.Supp. at 1169 n. 11 (emphasis in original). *See also Volk*, 816 F.2d at 1416 (plaintiffs failed to use due diligence; when plaintiffs acquired "clear knowledge of their claims, it was not reasonable for them to rely on reassuring comments from a broker"). *Cf. Gutierrez v.*

*Mofid,* 39 Cal.3d 892, 897–98, 218 Cal.Rptr. 313, 705 P.2d 886 (1985) (reliance on attorney's advice does not postpone the time of discovery, thus, extending the limitations period applicable to one who has already come to suspect he is a victim of malpractice).

First Federal and Missouri allege that two material factors in their decisions to invest in the pools were that Advance was to service the pools and that the mortgages to be included in the pools were to meet stringent criteria of creditworthiness. Amend.Comps. ¶¶ 30–34, 37. Nevertheless, they allege no attempts to investigate or even inquire about the reasons behind Advance's resignation in March, 1983. Nor do they allege any efforts to question Wells Fargo about the status of the pools after it sent them each a letter in May, 1983, informing them that "it was having difficulty finding a servicer other than NMEC to replace Advance because of the 'high number of defaults and foreclosures in the mortgage pools.'" Amend.Comps. ¶ 46 (quoting from Wells Fargo's letter of May, 1983).[8]

In light of these clear indications of trouble,[9] it was not reasonable for First Federal and Missouri simply to rely on Wells Fargo's investigation and assurances. *See Volk*, 816 F.2d at 1416. First Federal and Missouri have not alleged sufficient due diligence, indeed, have alleged no diligence at all, to toll the limitations period. Thus, their § 12(2) and state securities law claims also must be dismissed.[10]

---

8. First Federal and Missouri attempt to explain why they ignored this clear warning signal by arguing that they believed the problems Wells Fargo described were in the other pools, not their own, because they were receiving payments. But surely such problems should have given them cause to at least inquire about potential problems with their pools, given the representations defendants allegedly had made about the solid creditworthiness of the mortgages.

9. Lord Bissell also moved for summary judgment on Missouri's § 12(2) and state securities law claims, relying on Missouri's response to an interrogatory showing that it had knowledge in 1983 of Feldman's conviction, one of the material facts it alleges defendants failed to reveal. *See* Missouri Amend.Comp. ¶ 36(a). This provides additional support for dismissal of Mis-

souri's claims as barred by the statute of limitations.

10. NMEC and Feldman make two additional arguments, but they are clearly without merit. They contend that First Federal and Missouri's common law claims are also barred by the statute of limitations and were improperly joined to the First Amended Complaints without seeking leave of court. However, unlike the § 12 and state securities law claims, the common law claims are not barred on the face of the complaint. Plaintiffs allege that they were not on notice of their claims until January, 1985. The actual date of notice is thus a question of fact and cannot be decided on a motion to dismiss. *See SEC v. Seabord Corp.*, 677 F.2d 1301, 1309 (9th Cir.1982). Moreover, the Court

## II. RICO CLAIMS

The Savings Banks have cured the defects in their original RICO claims under 18 U.S.C. § 1962(a)–(d). *See NMEC*, 636 F.Supp. at 1170–71. However, defendants raise several additional arguments against the RICO claims on this new round.

### A. *Sufficiency of § 1962(a) and (b) Allegations*

■ Defendants Michael and Feldman challenge the sufficiency of the § 1962(a) and (b) allegations. Section 1962(a) provides that "It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity ... to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise...." The Savings Banks' § 1962(a) claims allege that "defendants Feldman and Michael received income from the above mentioned pattern of racketeering activity and used this income in the operation of NMEC, an enterprise...." First Federal, Missouri Amend.Comps. ¶ 85; Riverhead Amend.Comp. ¶ 74.

Defendants contend that these allegations are insufficient in that they fail to describe specific facts concerning the use of the racketeering income. This argument is meritless. Plaintiffs are not required to plead additional facts in support of their § 1962(a) claims.[11] *See Schreiber Distrib. Co. v. Serv–Well Furniture Co.*, 806 F.2d 1393, 1396–98 (9th Cir.1987) (allegations in complaint tracking statutory language of § 1962(a) and (b) upheld).[12]

■ Section 1962(b) states that: "It shall be unlawful for any person through a pattern of racketeering activity ... to acquire or maintain, directly or indirectly, any interest in or control of any enterprise...." The Savings Banks allege "that defendants Feldman and Michael acquired or maintained their interest or control of the enterprise NMEC through this pattern of racketeering activity." First Federal, Missouri Amend.Comps. ¶ 86; Riverhead Amend. Comp. ¶ 75. These allegations are sufficient to state a § 1962(b) claim. *Id.*

Michael and Feldman argue that the requirement that a § 1962(b) defendant engage in a pattern of racketeering activity to "maintain" an interest in an enterprise means that plaintiffs must allege some "threat" to the enterprise to which defendants responded by engaging in racketeering activity, citing *von Bulow by Auersperg v. von Bulow*, 634 F.Supp. 1284 (S.D. N.Y.1986), and *Hunt v. Weatherbee*, 626 F.Supp. 1097 (D.Mass.1986). Neither *von Bulow* nor *Hunt* imposes such a requirement. And the statute itself contains no such element.[13] Plaintiffs allegations are

looks to the date the original complaint was filed (March 22, 1985, as to First Federal and April 17, 1985, as to Missouri). The new common law claims clearly arise from the same transaction or occurrence as the claims set forth in the original complaints, so that the amendments relate back to the date of the original complaint. F.R.Civ.P. 15(c).

The common law claims were not improperly joined. Under F.R.Civ.P. 15(a), a plaintiff has a right to amend its complaint once as a matter of course before a responsive pleading is served. A motion to dismiss is not a responsive pleading under F.R.Civ.P. 7(a). The fact that a co-defendant has answered does not affect a plaintiff's right to amend the claims against a nonanswering defendant. *See Barksdale v. King*, 699 F.2d 744, 747 (5th Cir.1983).

11. Michael cites *Haynes v. Anderson & Strudwick, Inc.*, 508 F.Supp. 1303, 1317 (E.D.Va. 1981), in support of his contention that more particularity is required than simply tracking the statutory language. That case is wholly inapposite in that it concerned § 10(b) and Rule 10b–5; it is well-established that these securities fraud claims must meet the particularity requirements of F.R.Civ.P. 9(b).

12. Moreover, even if such particularity were required, these complaints taken as a whole, plead such additional facts. The Amended Complaints allege overall that Feldman and Michael initially took a small scheme and built it up into a huge fraudulent operation. Given defendants' concession that the complaints read liberally allege that defendants received income from racketeering activity, it is also reasonable to read the complaints as alleging that defendants used some or all of that income to operate and escalate the enterprise, *i.e.*, NMEC.

13. Even if allegations of a "threat" were required, Advance's letter to Wells Fargo, expressing concern about the irregularities in the mortgage pools, could be read as a threat to which Feldman and Michael responded by engaging in

sufficient to state a claim under § 1962(b).[14]

B. *Standing Under § 1962(a) and (b)*

■ Michael and Feldman contend that plaintiffs lack standing to bring claims under § 1962(a), (b) and (d) (conspiracy predicated on a § 1962(a) or (b) claim) because they allege that they have been injured only by the underlying predicate acts, which violate § 1962(c). Defendants cite several cases that hold that to state a claim under § 1962(a) or (b), a plaintiff must allege that its injury was caused, not just by the predicate acts of racketeering, but also by the investment and use of funds in the enterprise (§ 1962(a)) or the acquisition or maintenance of defendants' interest in or control of the enterprise (§ 1962(b)). *See Prodex v. Legg Mason Wood Walker*, No. 86–1950, slip op. (E.D.Pa., Feb. 5, 1987) [Available on WESTLAW, 1987 WL 6329] (available on LEXIS); *Donohoe v. Consol. Operating & Prod. Corp.*, No. 86–C–7543, slip op. (N.D.Ill., Jan. 8, 1987) [Available on WESTLAW, 1987 WL 5226] (available on LEXIS); *Gilbert v. Prudential–Bache Sec.*, 643 F.Supp. 107 (E.D.Pa.1986); *Heritage Ins. Co. v. First Nat'l Bank*, 629 F.Supp. 1412 (N.D.Ill.1986).

The Court declines to follow these cases in imposing a separate standing requirement for § 1962(a), (b) and (d). To impose such a requirement would be to revive the concept of a "distinct racketeering injury" rejected by the Supreme Court in *Sedima S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985). As one court recently noted in refusing to require an allegation of a separate injury to state a § 1962(a) claim:

In *Sedima* the Supreme Court rejected the notion that in order to have standing under RICO a plaintiff must suffer a "racketeering injury" separate and apart from any injuries he or she has sustained as a result of the predicate acts. While

*Sedima* involved an alleged violation of subsection (c), the same arguments defendants advance here were urged upon the Court there—namely that a plaintiff injured only by the underlying predicate racketeering acts lacked standing to bring a civil action. The Court rejected those arguments in no uncertain terms as to subsection (c), and in so doing did not in any way limit its reasoning to that subsection.

*King v. E.F. Hutton & Co.*, [current] RICO Bus. Disputes Guide (CCH) ¶ 6578, at 6840 (D.D.C.1987) [Available on WESTLAW, 1987 WL 8733].

The Ninth Circuit has also implicitly rejected a "separate injury" requirement for § 1962(a) and (d). In *Wilcox v. First Interstate Bank*, 815 F.2d 522 (9th Cir.1987), the court reversed summary judgment in defendant's favor on § 1962(a), (b) and (d) claims. In doing so, the court stated:

The Supreme Court recently expressly rejected the "racketeering enterprise injury" rule relied on by the district court.... The Court emphasized that a plaintiff must still allege each element prescribed in the statute to state a claim. The statute, however, requires no more. The compensable injury is the harm caused by the predicate act relied upon.

*Id.* at 529. The court drew no distinction between the plaintiff's claims under § 1962(a), (c) and (d). *See also Virden v. Graphics One*, 623 F.Supp. 1417, 1420–21, 1430 (C.D.Cal.1985) (post-*Sedima* case denying defendants' motion for summary judgment on § 1962(a), (b), (c) and (d) claims; rejecting defendants' argument that plaintiffs failed to state claims under those subsections because of their "failure to allege that they suffered 'racketeering-type' injuries distinct from and in addition to their injuries suffered as a result of the ... predicate acts").

a further pattern of racketeering to cover up the fraud. First Federal, Missouri Amend. Comps. ¶ 53; Riverhead Amend.Comp. ¶ 40.

**14.** Because claims under § 1962(a) and (b) are sufficiently pleaded, defendants' argument that no conspiracy claim is stated under § 1962(d) must also fail. Plaintiffs have remedied the

defect in their original claim under § 1962(d) by adding allegations of overt acts by the defendants in furtherance of the conspiracy. *See NMEC*, 636 F.Supp. at 1170–71; First Federal, Missouri Amend.Comps. ¶¶ 82, 87; Riverhead Amend.Comp. ¶¶ 71, 76.

The Court declines to imply an additional standing requirement into § 1962(a), (b) and (c). *Accord Snider v. Lone Star Art Trading Co.*, 659 F.Supp. 1249 (E.D. Mich., 1987); *Haroco Inc. v. American Nat'l Bank & Trust Co.*, 647 F.Supp. 1026, 1032–33 (N.D.Ill.1986); *Louisiana Power & Light v. United Gas Pipe Line*, 642 F.Supp. 781, 805–07 (E.D.La.1986).

### C. *Riverhead's § 1962(c) and (d) Claims*

■ Lord Bissell and Michael contend that Riverhead's Amended Complaint is defective in that it fails to plead that Riverhead was injured in its business or property by the conduct constituting the § 1962(c) and (d) violations.

Defendants cannot dispute that Riverhead alleges that defendants' RICO violations were the proximate cause of its injury. Riverhead Amend.Comp. ¶ 72. Defendants' argument is that Riverhead cannot claim its injuries were proximately caused by defendants' alleged § 1962(c) and (d) violations because Umpqua was the original purchaser of the Series "C" Certificate, which it subsequently resold to Riverhead. *See NMEC*, 636 F.Supp. at 1161–62. Thus, defendants argue, Riverhead was only secondarily or remotely injured, if at all.

Essentially, defendants are asking the Court to rule as a matter of law based on the pleadings that defendants' alleged RICO violations were not a proximate cause of Riverhead's injury. The Court has previously stated that it declines to make such a fact-based determination on a motion to dismiss in such a complex case. *Id.* at 1157. Although that ruling concerned the issue of whether B of A's alleged misconduct was a supervening cause of the harm caused to the Investor Institutions,[15] the principle is the same and the Court adheres to its earlier position. Moreover, there is substantial authority rejecting defendants' primary/secondary and direct/indirect injury distinctions. *See Miller v. Glen & Helen Aircraft, Inc.*, 777 F.2d 496, 498–99 (9th Cir.1985); *Terre Du Lac Ass'n, Inc. v. Terre Du Lac, Inc.*, 772 F.2d 467, 472–73 (8th Cir.1985), *cert. denied*, 475 U.S. 1082, 106 S.Ct. 1460, 89 L.Ed.2d 718 (1986); *Pandick Inc. v. Rooney*, 632 F.Supp. 1430, 1433 (N.D.Ill.1986).

### D. *Pattern of Racketeering Activity*

■ Feldman argues that First Federal and Riverhead's § 1962(c) claims are deficient in that they allege only a single loss caused by a one-time purchase of one mortgage-backed certificate. Feldman contends that such allegations of a single criminal episode as to each plaintiff is insufficient to constitute a pattern of racketeering activity.

This contention is clearly without merit. The Court has already ruled that plaintiffs have alleged sufficiently a pattern of racketeering. *See NMEC*, 636 F.Supp. at 1159, 1170. That ruling is the law of the case. *See United States v. Mills*, 810 F.2d 907, 909 (9th Cir.1987). In addition, the Ninth Circuit's recent decision in *Sun Savings & Loan Ass'n v. Dierdorff*, 825 F.2d 187 (9th Cir.1987), makes clear that "it is not necessary to show more than one fraudulent scheme or criminal episode to establish a pattern under *Sedima*" as long as the predicate acts "are not isolated or sporadic events because they posed a threat of continuing activity." *Id.* at 193, 194. There simply is no question that the threat of such ongoing activity is alleged in the First Amended Complaints.[16]

For all of the above reasons, the various motions to dismiss the Savings Banks' RICO claims are denied. However, the Savings Banks concede that the motions to strike their requests for injunctive relief under RICO must be granted in light of *Religious Technology Center v. Wollersheim*, 796 F.2d 1076, 1080–89 (9th Cir. 1986), *cert. denied*, —— U.S. ——, 107 S.Ct. 1336, 94 L.Ed.2d 187 (1987). There, the

---

**15.** The "Investor Institutions" are described and identified in *NMEC*, 636 F.Supp. at 1144 & n. 3.

**16.** "The fact that the last of a series of predicate acts may have completed the criminal scheme does not necessarily preclude a finding of conti-

nuity. As long as a threat of continuing activity exists at some point during the racketeering activity, the continuity requirement is satisfied." *Id.* at 194 n. 5.

court held that "injunctive relief is not available to a private party in a civil RICO action." *Id.* at 1084. *See also Republic of the Philippines v. Marcos*, 818 F.2d 1473, 1479 (9th Cir.1987) (same).

## III. SECTION 10(b) AND RULE 10b-5 CLAIMS

Advance attacks First Federal and Missouri's claims under § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (the "1934 Act"), and Rule 10b-5, of the regulations promulgated thereunder, 17 C.F.R. § 240.10b-5, on a number of grounds, but they are all without merit.

Contrary to Advance's assertions, First Federal and Missouri have alleged the elements required to state claims under § 10(b) and Rule 10b-5. They have alleged that Advance was a seller, First Federal, Missouri Amend.Comps. ¶¶ 14, 37, and actionable misrepresentations. *Id.* ¶¶ 30-33, 35. Even a superficial reading of the complaints reveals that they allege Advance's duty to disclose under the factors identified in *White v. Abrams*, 495 F.2d 724, 735 (9th Cir.1974). *See NMEC*, 636 F.Supp. at 1165. They allege their reliance on Advance. Amend.Comps. ¶ 37. Finally, they have, at least, alleged aiding and abetting liability on the part of Advance; they allege facts amounting to "substantial assistance" in the fraud. *See, e.g., id.* ¶¶ 32-40; *Harmsen v. Smith*, 693 F.2d 932, 943 (9th Cir. 1982), *cert. denied*, 464 U.S. 822, 104 S.Ct. 89, 78 L.Ed.2d 97 (1983). The more particular allegations Advance seeks is beyond the requirement imposed in this Circuit. The Court previously has held that the fraud allegations are sufficiently particular as to the common law fraud claims and the same is true of the § 10(b) and Rule 10b-5 claims. *See NMEC*, 636 F.Supp. at 1164.

## IV. BREACH OF FIDUCIARY DUTY

■ First Federal and Missouri charges Advance with breach of fiduciary duty for its alleged misconduct in servicing the pools. All of the Savings Banks also charge NMEC, which replaced Advance as the servicer of the pools after Advance resigned in March, 1983, with breach of fiduciary duty. NMEC and Advance contend that they owed no fiduciary duty to the Savings Banks, that their obligations were limited and fixed under the terms of the Pooling and Servicing Agreements.

The Savings Banks contend that NMEC and Advance became the equivalent of common law trustees when they agreed to service the pools. The Savings Banks argue that a fiduciary relationship arises when one party has a great degree of control over another's money or property. *See Vai v. Bank of America*, 56 Cal.2d 329, 338, 15 Cal.Rptr. 71, 364 P.2d 247 (1961). Plaintiffs allege that NMEC (and Advance in the case of First Federal and Missouri) had a large degree of control over their money. *See* Riverhead Amend.Comp. ¶¶ 17-19, 40; First Federal, Missouri Amend.Comps. ¶¶ 14-16, 42. In addition, the Savings Banks note that the fee the servicers received is analogous to the fee a trustee receives for its services. NMEC and Advance respond that they were merely contractors—suppliers of services whose responsibilities and duties were defined by the written agreement ratified by the participation of the certificateholders.

This issue requires factual development.[17] The Court cannot conclude to a certainty, based on the pleadings, that the Savings Banks will be able to prove no set of facts entitling them to relief for breach of fiduciary duty. *See NL Indus., Inc. v.*

---

**17.** However, there was, as the Savings Banks admit, a formal trustee in this arrangement— Wells Fargo. *See NMEC*, 636 F.Supp. at 1144. Although the relationship is not wholly clear, it appears that Wells Fargo selected and appointed the servicers, which suggests that they acted as the agents of Wells Fargo. *See* First Federal, Missouri Amend.Comps. ¶¶ 41-42; Riverhead Amend.Comp. ¶ 40. If this is the case, then NMEC and Advance may each have owed Wells Fargo a fiduciary duty as agent to principal, but they may not have owed a fiduciary duty to third parties, such as the Savings Banks. *See United States Liability Ins. Co. v. Haidinger-Hayes Inc.*, 1 Cal.3d 586, 594-95, 83 Cal.Rptr. 418, 463 P.2d 770 (1970); Restatement (Second) of Agency § 357 ("An agent who intentionally or negligently fails to perform duties to his principal is not thereby liable to a person whose economic interests are thereby harmed."). This theory, however, also requires additional factual development.

*Kaplan,* 792 F.2d 896, 898 (9th Cir.1986). The Court, thus, concludes that the breach of fiduciary duty claims are sufficient to withstand a motion to dismiss.

## V. THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

■ First Federal and Missouri charge Wells Fargo, Advance and NMEC with tortious breach of the implied covenant of good faith and fair dealing. Riverhead alleges the same claims against Wells Fargo and NMEC.[18]

A breach of the implied covenant may give rise to a cause of action sounding in tort if the contracting parties have a "special relationship." *May v. Watt,* 822 F.2d 896, 899 (9th Cir.1987) (citing *Wallis v. Superior Court,* 160 Cal.App.3d 1109, 1115–19, 207 Cal.Rptr. 123 (1984)). A "special relationship" exists when: (1) the parties are in inherently unequal bargaining positions, (2) the motivation of at least one party in entering the contract is other than for profit, (3) ordinary contract damages are inadequate, (4) one party is especially vulnerable and necessarily places its trust in the other party to perform, and (5) the other party is aware of this vulnerability. *Wallis,* 160 Cal.App.3d at 1118, 207 Cal. Rptr. 123. *See also May,* 822 F.2d at 899. The only one of these elements the Savings Banks arguably allege is the dependency arising from a fiduciary relationship. *See* Part IV, *supra.* However, this allegation standing alone is insufficient to establish the required special relationship. Nor does it appear that plaintiffs would be able to allege all of the elements necessary to support such a relationship. The Savings Banks are sophisticated financial institu-

tions; it is virtually impossible to see how they could assert they were in an inherently unequal bargaining position with defendants or any "especial vulnerability." Further, it is impossible to imagine what kind of nonprofit motivation plaintiffs could allege. Finally, the Savings Banks suggest no reason why ordinary contract damages would be inadequate in this case.[19] Consequently, the Savings Banks claims for tortious breach of the implied covenant of good faith and fair dealing must be dismissed.

## VI. ASSIGNMENT AND PRIVITY OF CONTRACT RE RIVERHEAD

■ The Series "C" Certificate was originally purchased by Umpqua in April, 1982. In April, 1984, Riverhead purchased this Certificate from Umpqua through its broker MEBAC. Advance contends that Riverhead fails to show an assignment of a breach of contract claim from Umpqua to Riverhead. In a related argument, Advance contends that Riverhead's claim for negligent performance of duty fails because Riverhead has not shown privity of contract between it and Advance because Advance had resigned as servicer before Umpqua sold its certificate to Riverhead.

Advance, in essence, raises factual issues that cannot be resolved on a motion to dismiss. Riverhead has pleaded all that it must at this stage regarding the assignment of the breach of contract claim. Riverhead Amend.Comp. ¶ 113. *See Stanton v. Pratt,* 18 Cal.2d 599, 602, 166 P.2d 609 (1941). Advance's argument that Riverhead fails to state a claim for negligent performance of duty also is without merit. The California Supreme Court has stated:

---

18. Although not entirely clear from the Amended Complaints, the Savings Banks contend that these claims sound in tort. Savings Banks Consol. Mem. in Opp. at 71–74. They also seek leave to amend their complaints to add allegations to support their prayers for punitive damages on these claims, which were inadvertently omitted from these claims, except those against Wells Fargo. In light of the disposition of these claims, leave to amend would be futile and, therefore, is denied.

19. The Savings Banks reliance on *Quigley v. Pet, Inc.,* 162 Cal.App.3d 877, 208 Cal.Rptr. 394 (1984), is misplaced and they misconstrue its reasoning. At issue there was the separate tort of bad faith denial of the existence of a contract. Moreover, *Quigley* does not encourage a liberal approach to pleading tort theories related to breach of contract; contrariwise, the court suggested that such theories be *narrowly* construed so as to allow "more freedom of action among contracting parties." *Id.* at 892.

The determination whether in a specific case the defendant will be held liable to a third person not in privity is a matter of policy and involves the balancing of various factors, among which are the extent to which the transaction was intended to affect the plaintiff, the foreseeability of harm to him, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, and the policy of preventing future harm.

*Biakanja v. Irving,* 49 Cal.2d 647, 650, 320 P.2d 16 (1958). Riverhead has alleged several of the factors identified in *Biakanja.* Riverhead Amend.Comp. ¶¶ 114–117. These allegations are sufficient to withstand a motion to dismiss. *See Kent v. Bartlett,* 49 Cal.App.3d 724, 731, 122 Cal. Rptr. 615 (1975) (reversing demurrer to complaint that alleged only one the *Biakanja* factors—foreseeability of harm to plaintiffs).

## VII. JOINDER OF MANUFACTURERS HANOVER

■ Manufacturers Hanover was added as a defendant in all three of the Savings Banks' First Amended Complaints. Manufacturers Hanover argues, *inter alia,* that it has been improperly joined at a late date in this case and that the First Amended Complaints fail to state either a direct claim or a claim of successor-in-interest liability against it.

The Savings Banks appear to concede that the proper procedure would have been to seek a court order under F.R.Civ.P. 21, permitting the joinder of Manufacturers Hanover. *See Pacific Gas & Elec. Co. v. Fibreboard Prod., Inc.,* 116 F.Supp. 377, 382 (S.D.Cal.1953); Savings Banks Consol. Mem. in Opp. at 94. They now seek such an order.[20]

The Savings Banks conceded at the hearing on these motions that the only claim they could plead against Manufacturers Hanover would be for breach of contract

under their Ninth Claim. They also implicitly concede, as they should, that their First Amended Complaints do not state claims for breach of contract against Manufacturers Hanover. They have attached a proposed amendment in which they attempt to clarify the relationship between Manufacturers Hanover and Wells Fargo. The Court will, thus, treat this as a motion for leave to add Manufacturers Hanover as a defendant under F.R.Civ.P. 21 and to amend the Savings Banks First Amended Complaints under F.R.Civ.P. 15(a).

Under Rule 15(a), leave to amend "shall be freely given when justice so requires." "Valid reasons for denying leave to amend include undue delay, bad faith, prejudice, and futility." *California Architectural Bldg. Prod., Inc. v. Franciscan Ceramics, Inc.,* 818 F.2d 1466 (9th Cir.1987) (citing *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962)). There are no allegations of bad faith here. However, Manufacturers Hanover does contend that plaintiffs unduly delayed in adding it as a defendant and that its late joinder to this complex lawsuit has prejudiced it by preventing it from fully participating in the accelerated, three-track discovery that has already taken place. More importantly, however, the Court concludes that the proposed amendment would be futile, in that it still would fail to state a claim against Manufacturers Hanover.

Plaintiffs would allege Manufacturers Hanover's liability as a successor-in-interest to Wells Fargo. Yet they have failed to allege any facts that support that theory of liability. *See Ghouth v. Conticommodity Serv., Inc.,* 642 F.Supp. 1325, 1328–29 (N.D.Ill.1986). *See generally Gee v. Tenneco, Inc.,* 615 F.2d 857, 863 (9th Cir.1980) (citing *Ray v. Alad Corp.,* 19 Cal.3d 22, 136 Cal.Rptr. 574, 560 P.2d 3 (1977)). Indeed, plaintiffs appear merely to allege an agency relationship between Wells Fargo and Manufacturers Hanover. *See* Savings Banks' Consol. Mem. in Opp., Ex. A ("Manufacturers assumed all operational and ad-

---

**20.** To the extent that Riverhead seeks leave of Court for an order permitting its joinder of Advance in its First Amended Complaint, such leave is granted. Advance has not objected to its being joined as a defendant.

ministrative duties and obligations required under the Pooling and Servicing Agreements, and otherwise acted as Wells Fargo's agent with respect to all of Wells Fargo's rights, duties, and obligations referred to herein. . . ."). Such allegations fail to state a basis for successor liability even under a liberal reading. *See Ghouth,* 642 F.Supp. at 1328–29; *Gee,* 615 F.2d at 863. Thus, it would be futile to permit the Savings Banks further to amend their First Amended Complaints. The Savings Banks' sole putative claim against Manufacturers Hanover for breach of contract must be dismissed. Leave to amend is denied.

## VIII. MOTIONS TO STRIKE

Aside from the motion to strike the Savings Banks' request for injunctive relief under RICO, which is well-founded as discussed in Part II, *supra,* all of defendants' motions to strike are denied for the reasons discussed in *PART TWO, infra.*

## PART TWO: BANK OF AMERICA'S SECOND AMENDED COMPLAINT

### PROCEDURAL BACKGROUND

As indicated, dismissal in part of B of A's original complaint was with leave to amend. *NMEC,* 636 F.Supp. at 1161. The Court there held that although B of A could pursue RICO claims both in its own right and as the assignee of the Invester Institutions, B of A's RICO claims under 18 U.S.C. § 1962(c) and (d) were deficient in failing adequately to allege a RICO "enterprise" and overt acts in furtherance of a RICO conspiracy. The Court also held that B of A could not proceed on its tort and federal and state securities law claims as the assignee of the Investor Institutions, but instead must pursue any remedies under the laws of contribution and indemnity. *Id.* B of A has since amended twice.

B of A's First Amended Complaint added as defendants John C. Hayden, president of Glacier General Assurance Company, one of the alleged conspiring mortgage insurers; Marvin H. Weiss, a principal in alleged shell corporations that posed as lenders and borrowers on loans in the NMEC pools; Ben Adelman, an attorney who represented NMEC, Feldman, Glacier and several of the alleged Weiss shell companies; Kay M. Aevermann, a Lord Bissell attorney who provided substantial legal assistance to NMEC in connection with its mortgage-backed certificate program; and the partners of Lord Bissell. To rectify the problems in its original complaint, B of A added allegations naming NMEC as the RICO enterprise and allegations of overt acts in furtherance of the RICO conspiracy. It also added claims against Feldman and Michael for violations of § 1962(a), (b) and (d) (to its already pending § 1962(c) and (d) claims). B of A also alleged a claim for equitable indemnity based on defendants' violations of federal and state securities laws and their acts of fraud and negligence. Finally, the First Amended Complaint alleged claims against all defendants for fraud and conspiracy to defraud and, as the Investor Institutions' assignee, against NMEC for breach of contract.

Motions to dismiss B of A's First Amended Complaint were filed by Lord Bissell, the Lord Bissell partners, Aevermann, Michael, West Pac Corporation and Kent B. Rogers (collectively "West Pac"), NMEC, Feldman and Adelman.[21] The only basis on which subject matter jurisdiction was predicated as to the Bank's claims against NMEC was that the equitable indemnity claims based on defendants' alleged violations of federal securities laws "arise under" federal law. 28 U.S.C. § 1331. Because the existence of jurisdiction on this basis was unclear to the Court,[22] and because the Ninth Circuit's intervening decision in *Schreiber,* 806 F.2d 1393,[23] provided

---

**21.** B of A and Lord Bissell subsequently reached a settlement and the motions of these defendants were withdrawn.

**22.** If no independent basis of subject matter jurisdiction over the claims against NMEC were present, NMEC would be a "pendent party" as to whom the Court would not have jurisdiction.

**23.** In *Schreiber,* the Ninth Circuit held that the "enterprise" need not be a separate and distinct entity from the "person" under § 1962(a) and (b). 806 F.2d at 1396–98.

an alternate and secure basis for federal subject matter jurisdiction, the Bank was permitted to file a further amended complaint alleging a claim for relief against NMEC "under 18 U.S.C. § 1962(a) and (b), and 1962(d) as it pertains to subsections (a) and (b)...."[24] Pretrial Management Order No. 13, ¶ 4.

B of A's Second Amended Complaint is identical to the First Amended Complaint, except that it names NMEC in addition to Feldman and Michael in its claims for relief under § 1962(a) and (d) (Second Claim for Relief) and under § 1962(b) and (d) (Third Claim for Relief).[25]

## DISCUSSION

### I. COMPARATIVE EQUITABLE INDEMNITY

To discuss this issue, it is necessary to summarize briefly B of A's role in the alleged fraud and in this litigation. B of A was appointed escrow agent and trustee for most of the NMEC pools. Wells Fargo, a defendant in the Savings Banks' action, was the trustee for the other pools. *See PART ONE, supra.* As trustees of their respective pools, B of A and Wells Fargo were to review the documentation NMEC provided regarding each mortgage in order to see that it complied with all applicable standards set out in the pooling and servicing agreements.

In October, 1984, one of the Investor Institutions for which B of A acted as trustee, advised it of "certain irregularities in the processing and documentation" of the mortgages comprising that Investor Institution's pool. B of A initiated an investigation of the NMEC pools. In its investigation, the Bank learned not only of the alleged NMEC-managed fraud, but also that its own employees had not, in the Bank's words, "adequately discharged the Bank's responsibilities" as escrow agent and trustee. As a result of its investigation, B of A filed an action in California state court against several of its own employees for their roles in the handling of the NMEC pools, alleging claims for indemnity, negligence, gross negligence, breach of fiduciary duty, equitable subrogation, breach of insurance contracts and declaratory relief regarding insurance agreements.[26]

B of A's investigation also led it to conclude that as a result of the fraud, the Investor Institutions for which it had acted as trustee stood to lose all or most of their investments in the NMEC pools. The Bank, therefore, decided to "resolve its liability" to those Investor Institutions by repurchasing their certificates or by replacing the mortgages in the pools represented by the certificates.[27] After compensating the Investor Institutions for their losses, the Bank was left with a net loss of $95 million. However, in return for the compensation, the Investor Institutions assigned to B of A any claims they might have against any of the defendants. B of A then filed this action alleging claims for violation of federal and state securities laws, common law fraud and breach of

---

**24.** Because the additional claim allowed would directly affect only NMEC, NMEC was permitted to file a supplemental memorandum in support of its motion to dismiss and it has done so. West Pac also filed a Supplemental Motion to Dismiss, although it is not named in the Bank's Second Claim for relief for violations of § 1962(a), (b) and (d). Moreover, these supplemental papers raise no issues as to the amendments adding NMEC to that claim. Consequently, its papers have been disregarded by the Court. The Bank has asked for sanctions under F.R.Civ.P. 11 and Local Rule 27. However, such sanctions do not appear to be warranted for what appears to be a misunderstanding of the Court's supplemental briefing order.

**25.** The Second Amended Complaint also differs from the First Amended Complaint in that it pleads violations of § 1962(a) and (b) (and subsection (d) conspiracies based on those violations) as separate claims.

**26.** *Bank of America N.T. & S.A. v. Powers, et al.,* Los Angeles County Superior Court, Case No. C–536776 ("*Powers*"). On these motions, the Court takes judicial notice of the allegations of B of A's First Amended Complaint in *Powers. See Mack v. South Bay Beer Distrib., Inc.,* 798 F.2d 1279, 1282 (9th Cir.1986).

**27.** Unlike B of A, Wells Fargo chose not to pay off its beneficiaries. Therefore, as discussed in *PART ONE,* Wells Fargo, which had performed essentially the same trustee functions as B of A with respect to the Savings Banks' mortgage pools, was named by its beneficiaries, the Savings Banks, as a defendant.

contract as the assignee of the Investor Institutions. B of A also brought a RICO claim both as an assignee and in its own right.

The Court held on the earlier round of motions to dismiss that all of the claims brought by the Bank as assignee, except the RICO claims, were barred by the "one-satisfaction rule." *NMEC,* 636 F.Supp. at 1147. The Court held that B of A's payments to its Investor Institutions constituted full satisfaction of those claims and thus operated to discharge fully all other tortfeasors from any liability to those Investor Institutions. *Id.* at 1147–48. The Court granted B of A leave to file an amended complaint for contribution and/or indemnity. *Id.* at 1147.[28]

In its Second Amended Complaint, B of A alleges six claims for "equitable indemnity." Three of these claims are based on asserted underlying violations of federal securities laws by defendants (§ 10(b) of the 1934 Act and §§ 17(a) and 12(2) of the 1933 Act). One claim is based on violation of state securities laws (Cal.Corp.Code §§ 25401, 25501 and 25504.1). The two remaining claims are based on common law theories of fraud and negligence.

On each of these claims, the Bank seeks total or partial equitable indemnity under the doctrine of comparative equitable indemnity,[29] set forth in *American Motorcycle Ass'n v. Superior Court,* 20 Cal.3d 578, 146 Cal.Rptr. 182, 578 P.2d 899 (1978). In that decision, the California Supreme Court modified the common law doctrine of equitable indemnity, which concerned the allocation of loss among multiple tortfeasors. In describing the development of the doctrine, the court noted:

the equitable indemnity doctrine originated in the common sense proposition that when two individuals are responsible for a loss, but one of the two is more culpa-

ble than the other, it is only fair that the more culpable party should bear a greater share of the loss. Of course, at the time the doctrine developed, common law percepts precluded any attempt to ascertain comparative fault; as a consequence, equitable indemnity, like the contributory negligence doctrine, developed as an all-or-nothing proposition.

*Id.* at 593, 146 Cal.Rptr. 182, 578 P.2d 899.

However, California courts were "reluctant to shift the entire loss to a party who was simply slightly more culpable than another." *Id.* at 594, 146 Cal.Rptr. 182, 578 P.2d 899. Thus, courts struggled to find an equitable way to apply what was intended to be an equitable doctrine. Some permitted the total shift of liability where the negligence of the indemnitor could be labelled "active," "primary," or "positive," and the negligence of the indemnitee as "passive," "secondary," or "negative." Others indicated that the test was whether the indemnitee's liability was "primary," "secondary," "constructive," or "derivative." *Id.* The results were inconsistent and unsatisfactory. *Id.* at 594–95, 146 Cal. Rptr. 182, 578 P.2d 899. The court noted that the "all-or-nothing" approach had prevented courts from reaching a fair solution in the large number of cases in which equity demanded an apportionment of loss among the wrongdoers in proportion to their degree of culpability, rather than the complete shifting of the entire loss to one or another tortfeasor. *Id.* at 595, 146 Cal. Rptr. 182, 578 P.2d 899. Thus, the court modified the equitable indemnity rule to permit the apportionment of liability among multiple tortfeasors whose tortious conduct combined to cause an indivisible injury. *Id.* at 598, 146 Cal.Rptr. 182, 578 P.2d 899.

Although *American Motorcycle Ass'n* involved concurrent tortfeasors, compara-

---

**28.** The Court expressed no opinion at that time as to whether B of A would be able to state a claim for contribution or indemnity. *Id.* at 1150 n. 19.

**29.** Under federal securities caselaw, the *sharing* of liability based on comparative fault is generally known as "contribution." The total *shifting* of liability to another tortfeasor is termed "in-

demnity." The Court will use these terms when discussing federal caselaw and will use "partial equitable indemnity" and "total equitable indemnity" when discussing the Bank's state law indemnity claims, although these latter terms appear to describe essentially the same concepts as "contribution" and "indemnity," respectively.

tive equitable indemnity is also available among successive tortfeasors who become legally obligated to an injured party for the same injury, *see, e.g., Sacramento v. Gemsch Inv. Co.,* 115 Cal.App.3d 869, 877, 171 Cal.Rptr. 764 (1981), and between a negligent tortfeasor and a reckless tortfeasor as well as between negligent tortfeasors inter se. *See Allen v. Sundean,* 137 Cal.App.3d 216, 224–26, 186 Cal.Rptr. 863 (1982).

The Bank pleads its comparative equitable indemnity claim in the following manner. It first pleads the elements necessary to establish the defendants' tortious conduct on each claim and alleges that those tortious acts proximately caused the injury to the Investor Institutions. It then pleads that it compensated the Investor Institutions for their losses. The Bank alleges that its liability for these losses "was vicarious and secondary and arose solely as a result of the wrongful acts of certain employees in the performance of the escrow and trust services provided under the written escrow instructions and Servicing Agreements in connection with the NMEC transactions." Thus, the Bank contends that the defendants and the Bank were joint tortfeasors. The Bank then requests total or partial equitable indemnity from defendants.

Defendants raise a variety of objections to these claims. NMEC and Feldman contend that comparative equitable indemnity applies only in a personal injury or noncommercial lawsuit, citing *Carroll v. Gava,* 98 Cal.App.3d 892, 159 Cal.Rptr. 778 (1979), and *Godfrey v. Steinpress,* 128 Cal.App.3d 154, 180 Cal.Rptr. 95 (1982). This argument fails for two reasons. First, these cases are distinguishable from the case at hand. *Carroll* was an action for misrepresentation that property sold to plaintiff was zoned for a mobilehome park. Defendant argued that the doctrine of comparative negligence should bar judgment for plaintiffs, because they were negligent in relying on the misrepresentation. *Carroll* refused to apply comparative negligence reasoning that in a fraud action the entire risk of falsity was on the person making the representation. *Godfrey* is similarly inapposite. There, the court held that the trial court did not err in refusing to give defendant's instructions on contributory negligence where the fraudulent concealment claim alleged and proved was a deliberate, calculated act by the defendant and no negligence was involved. Neither *Carroll* nor *Godfrey* involved the question of apportionment of liability among joint tortfeasors under comparative equitable indemnity. Second, as at least two courts of appeal have since pointed out, neither *Carroll* nor *Godfrey* suggested "a sound reason for ruling out comparative indemnity among joint tortfeasors in a commercial misrepresentation action." *Kohn v. Superior Court,* 142 Cal.App.3d 323, 332, 191 Cal.Rptr. 78 (1983). *See also Considine Co. v. Shadle, Hunt & Hagar,* 187 Cal.App.3d 760, 768–69, 232 Cal.Rptr. 250 (1986) (following *Kohn* ). The doctrine of comparative equitable indemnity applies to commercial tort litigation as well as to personal injury actions. *See Kohn,* 142 Cal.App.3d at 332, 191 Cal.Rptr. 78.[30]

NMEC and Feldman argue that even if comparative equitable indemnity does apply to business tort litigation, the Bank has not stated claims under the doctrine because its pleadings in the state court action against its employees contain admissions that it is an intentional tortfeasor, thus, barring it from any award of equitable indemnity. It is well-established that an intentional tortfeasor cannot seek either total or partial equitable indemnity. *See* Cal.Code Civ. Proc. § 875(d); *Allen,* 137 Cal.App.3d 216, 186 Cal.Rptr. 863 (1982). NMEC contends that the Bank "in essence" charges its em-

---

**30.** *Carroll* also stated that "application of comparative fault principles, designed to mitigate the often catastrophic consequences of personal injury, would only create unnecessary confusion and complexity [in commercial litigation]." 98 Cal.App.3d at 897, 159 Cal.Rptr. 778. This statement is not persuasive. Partial equitable indemnity being a form of contribution, footnote 29, *supra,* contribution on the basis of the relative culpability of joint tortfeasors is no less appropriate or feasible in commercial litigation than in personal injury actions. *See Smith v. Mulvaney,* 827 F.2d 558 (9th Cir.1987).

ployees with fraud. However, on reading the First Amended Complaint in the *Powers* action, the Court concludes that, at most, the Bank charges its employees with recklessness rather than intentional misconduct. *See* B of A's Consol. Mem. in Opp., Ex. A. A reckless tortfeasor is not barred from seeking comparative equitable indemnity. *Allen*, 137 Cal.App.3d at 224–26, 186 Cal.Rptr. 863. Like many of the other issues in these actions, this issue is unsusceptible of resolution on the pleadings.

Even so, however, the Bank's admissions in the state court action against its employees and in its claims here preclude it from seeking *total* equitable indemnity from defendants in this action. The Bank's standing to bring its equitable indemnity claims is predicated on its admitted, indeed, vigorously argued, status as a joint tortfeasor in causing the Investor Institutions' injury. However, B of A argues that it is entitled to total indemnity because it was only "vicariously" liable to the Investor Institutions because of its employees wrongful conduct. B of A contends that where a party seeking comparative equitable indemnity is only vicariously liable, the total loss may be apportionment to the actual wrongdoers, citing *Standard Pac. v. A.A. Baxter Corp.*, 176 Cal.App.3d 577, 222 Cal.Rptr. 106 (1986). However, *Standard Pac.* and the unsettled issue it confronted do not apply in the circumstances here.

B of A confuses the imputed liability arising from the doctrine of *respondeat superior* with the vicarious liability at issue in strict liability cases, such as *Standard Pac.* That case concerned apportionment between a settling defendant and a nonsettling defendant who had been held strictly liable (public policy imposed non-negligent liability) who attempted to obtain total indemnification from the settling defendant.[31]

B of A's posture here *vis-a-vis* the defendants is very different from that of the strictly liable defendant *vis-a-vis* the other tortfeasors in the *Standard Pac.* situation. As B of A argues, the goal of comparative equitable indemnity is to apportion liability to joint tortfeasors according to their respective culpability. However, because B of A is a corporation, it "in a literal sense can never be guilty of 'actual' negligence ... except to the extent that the acts of [its] agents, servants and employees are imputable and chargeable to [it]." *Horn & Barker, Inc. v. Macco Corp.*, 228 Cal.App. 2d 96, 106, 39 Cal.Rptr. 320 (1964). If one were to accept B of A's premise, then all liability arising under the doctrine of *respondeat superior* would become the basis for an action for total equitable indemnity by the mere application of that doctrine. *Cf. id.* (making a similar argument regarding pre-*American Motorcycle* equitable indemnity based on a passive/active negligence analysis). Such a rule would conflict with the principle that "total equitable indemnity may be sought only when *all* of the alleged tortious conduct can be attributed to one party," *Stratton v. Peat, Marwick, Mitchell & Coo*, 190 Cal.App.3d 286 at 290, 235 Cal.Rptr. 374. Unlike the "no-fault" strict liability situation, *admittedly there is fault here*, even if in *respondeat superior* terms, it belongs primarily to the Bank's employees and only secondarily to the Bank. The Bank's standing to bring its equitable indemnity claims rests on its status as a joint tortfeasor with defendants based on the Bank's employees' wrongful conduct. The Bank cannot have joint tort-

---

**31.** The California authorities are split on the issue of whether, despite a good faith determination under Cal.Code Civ.Proc. § 877.6, a nonsettling defendant, who is factually innocent of any wrongdoing, but is held liable by contract, statute or other public policy considerations, is entitled to seek total equitable indemnity. *Standard Pac.*, which held that a "good faith settlement bars the common law total equitable indemnification claim by a defendant who is only secondarily or vicariously liable," represents the majority view. *See Stratton v. Peat, Marwick,*

*Mitchell & Co.*, 190 Cal.App.3d 286, 290, 235 Cal.Rptr. 374 (1987) (quoting *Standard Pac.*, 176 Cal.App.3d at 585). *Tulco, Inc. v. Narmco Materials, Inc.*, 191 Cal.App.3d 116, 118–19, 236 Cal. Rptr. 224 (1987) (quoting *Angelus Assoc. Corp. v. Neonex Leisure Prod., Inc.*, 167 Cal.App.3d 532, 541, 213 Cal.Rptr. 403 (1985)), *review granted*, 238 Cal.Rptr. 66, 737 P.2d 1350 (1987), which held that such a claim is not barred, represents the minority view. *See Stratton*, 190 Cal.App.3d at 290, 235 Cal.Rptr. 374.

feasor status and *total* equitable indemnity too. It must be content with *partial* equitable indemnity in this action.[32]

■■ Defendants raise several arguments directed specifically at the Bank's claims for equitable indemnity based on defendants' violations of federal securities laws. NMEC and Feldman argue that it is hornbook law that the availability of contribution or indemnification for violations of the securities laws is a matter of federal law, not state law.[33] *See Heizer Corp. v. Ross*, 601 F.2d 330, 331 (7th Cir.1979); *Odette v. Shearson, Hamill & Co.*, 394 F.Supp. 946, 954 n. 9 (S.D.N.Y.1975). The Bank responds that it is not seeking indemnity under federal securities laws; it is seeking that remedy under state law.[34] In so doing, it argues that state equitable indemnity law is preempted neither by federal occupation of the field nor by conflict with the federal statutes and that permitting state law indemnity or contribution claims (*i.e.*, total or partial equitable indemnity claims) would enhance rather than frustrate the Congressional purpose underlying the securities laws.

State law is preempted only when Congress demonstrates an intent to "occupy a given field" to the complete exclusion of state regulation or when the state regulation "actually conflicts with federal law, that is, when it is impossible to comply with both state and federal law, or where the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress." *Silkwood v. Kerr–McGee Corp.*, 464 U.S. 238, 248, 104 S.Ct. 615, 621, 78 L.Ed.2d 443 (1984) (citations omitted).

Congress clearly has not intended to occupy the field of securities fraud regulation. Both the 1933 and 1934 Acts contain provisions explicitly saving consistent state regulation from preemption. 15 U.S.C. § 77r; 15 U.S.C. § 78bb(a). Indeed, 15 U.S.C. § 78bb(a) explicitly provides that "the rights and remedies provided by [the 1934 Act] shall be in addition to any and all other rights and remedies that may exist at law or equity." *Cf. Globus v. Law Research Serv.*, 418 F.2d 1276, 1286 (2d Cir. 1969), *cert. denied*, 397 U.S. 913, 90 S.Ct. 913, 25 L.Ed.2d 93 (1970) ("courts have endeavored to treat the '33 and '34 Acts *in pari materia* and to construe them as a

**32.** Even accepting the Bank's premise that, as between it and its employees, it is only secondarily liable, it should not be able to apportion the primary liability of its own employees on to defendants here. We are not here concerned with the rights and liabilities as between the Bank and its employees. Those issues are before the state court in *Powers* and may also be involved in *Schwartz v. BankAmerica Corp.*, No. 85–2732, slip op. (9th Cir. Sep. 2, 1987). If the Bank were permitted to pursue and recover on a total indemnity claim here and if it were also successfully to pursue its claims against its employees in *Powers*, the Bank would be reaping a double recovery.

Although the allegations of B of A's Second Amended Complaint are not necessarily limited to such a reading, B of A has been vigorous in characterizing its Fourth, Fifth and Sixth Claims as claims only for equitable indemnity under state law, *i.e.*, they are not pursuing equitable contribution under federal law. This may be because of the Court's earlier statements that under federal law (total) indemnity was unavailable and the Bank's recovery would be limited to a "proportionate share" contribution, *NMEC*, 636 F.Supp. at 1150, and the Bank was hoping to avoid this limitation by proceeding under state law. The issue of total recovery from defendants here has now been mooted.

**33.** Thus, NMEC and Feldman argue that the Bank cannot seek contribution because it is available only to joint securities laws violators and the Bank has not alleged it is a securities law violator. *See Laventhol, Krekstein, Horwath & Horwath v. Horwitch*, 637 F.2d 672, 674 (9th Cir.1980), *cert. denied*, 452 U.S. 963, 101 S.Ct. 3114, 69 L.Ed.2d 975 (1981). Defendants also point out that indemnification is not permitted under federal securities laws. *See id.* at 676. These points are irrelevant except to the extent they bear on the issue of preemption because, as stated, the Bank is not pursuing contribution or indemnity under the federal securities laws.

**34.** A state law indemnity or contribution claim based on a violation of a federal statute is not unprecedented. The Bank points to a line of cases approving state law indemnity in favor of railroads held liable under the Federal Employers' Liability Act against a third party guilty of state law negligence. *See Southern Pac. Transp. Co. v. Ohbayashi Am. Corp.*, 147 Cal.App.3d 233, 237–38, 195 Cal.Rptr. 63 (1983); *Cobb v. Southern Pac. Co.*, 251 Cal.App.2d 929, 932–33, 59 Cal.Rptr. 916 (1967).

single comprehensive scheme of regulation").

Nor would a rule permitting a party who is a joint tortfeasor under state law to obtain partial equitable indemnity from a federal securities law violator conflict with federal law.[35] Courts have recognized implied rights of contribution under both § 12(2), e.g., *Wassel v. Eglowsky*, 399 F.Supp. 1330 (D.Md.1975), *aff'd*, 542 F.2d 1235 (4th Cir.1976), and § 10(b), e.g., *Smith v. Mulvaney*, 827 F.2d 558 (9th Cir.1987) (implied right to contribution under Rule 10b–5; contribution must be based on defendants' relative culpability). Thus, on these points, federal law and state law are in harmony, not conflict. In addition, as B of A points out, to permit it to obtain partial equitable indemnity would further the policy reasons behind contribution. It would ensure "a more fair and equal distribution of justice by spreading plaintiffs' losses proportionately among all wrongdoers," and would ensure "that the deterrent effect of the law will be felt by all persons contemplating liability, rather than just those persons most likely to be named as defendants by the plaintiffs." *Nelson v. Bennett*, 662 F.Supp. 1324, 1328 (E.D.Cal. 1987).

■ However, the Bank may no longer pursue its claim for equitable indemnity based on defendants' violation of § 17(a) of the '33 Act, since the Ninth Circuit no longer recognizes a private right of action under § 17(a). *In re Washington Pub. Power Supply Sys. Sec. Lit.*, 823 F.2d 1349, 1358 (9th Cir.1987) (*en banc*).

Thus, the Court concludes that B of A may pursue its claims for *partial* equitable indemnity based on defendants' violations of §§ 10(b) and 12(2), as well as their violations of state securities laws, common law fraud and negligence (Claims Four, Six, Seven, Eight and Nine).[36]

Having resolved this issue, determination of a number of related issues raised by defendants fall easily into place. NMEC argues that the Bank was not a purchaser or seller, so it cannot recover for a violation of § 10(b). That the Bank was not a purchaser or seller is irrelevant, because the Investor Institutions were purchasers and the Bank seeks merely to establish defendants' liability as joint tortfeasors based on their conduct toward the Investor Institutions. NMEC also contends that the statute of limitations has run on the securities violations alleged. Again, this misses the point that the Bank is asserting a state law, not a federal law claim. B of A's cause of action for equitable indemnity arose when it paid the tort victims, not when the victims' claims against the securities violators accrued. *See People v. Superior Court*, 26 Cal.3d 744, 748, 163 Cal. Rptr. 585, 608 P.2d 673 (1980). B of A's claim is clearly not time-barred under any applicable statute of limitations in that its original complaint was filed within a few months (March 1, 1985) after the Bank settled with the Investor Institutions (late 1984 and early 1985).

West Pac attempts to defeat the Bank's equitable indemnity claims by arguing an issue settled on the first round of motions to dismiss—that these certificates were not "securities." The Court abides by its earlier ruling that it will not decide that issue on a motion to dismiss. *NMEC*, 636 F.Supp. at 1162–64. Adelman argues that the Bank has failed to state a claim for equitable indemnity based on his alleged violation of § 10(b). He argues that the showing of his participation is too limited to support allegations of "substantial assistance" in the fraud. *See Harmsen v. Smith*, 693 F.2d 932, 943 (9th Cir.1982), *cert. denied*, 464 U.S. 822, 104 S.Ct. 89, 78 L.Ed.2d 97 (1983). Adelman, in essence, seeks more particular allegations than is

---

**35.** Because of the holding that the Bank is not entitled to total equitable indemnity on these facts, it is unnecessary to reach the issue of whether federal law preempts such a right.

**36.** On the last set of motions to dismiss, the Court declined to decide whether the exercise of pendent jurisdiction over the state-law claims

would be appropriate. The Court now concludes, in the exercise of its discretion, that the exercise of pendent jurisdiction is appropriate in this case. This determination at the pleading stage does not foreclose further consideration of the issue at later stages of these actions.

required by Ninth Circuit law. The Court concludes that the allegations stated are sufficient.[37] *See* Amend.Comp. ¶¶ 77–81.

## II. RICO CLAIMS

The Court previously determined that the assignments of the RICO claims were valid, but dismissed them because B of A failed sufficiently to plead the existence of an enterprise and overt acts in furtherance of the alleged RICO conspiracy. Defendants raise a host of new objections to the Bank's RICO claims in its Second Amended complaint, especially concerning the Bank's addition of NMEC as a defendant in the § 1962(a) and (b) claims. However, virtually all of these issues have been resolved by the rulings on the first round of motions to dismiss or by the Court's rulings in *PART ONE, supra.*

■■■ NMEC contends that the Bank's new RICO claims under § 1962(a) and (b) must be dismissed because it fails to show a benefit to NMEC as required under the statutes. However, B of A does allege a benefit to NMEC. Amend.Comp. ¶¶ 103, 110. Virtually identical allegations were held to be sufficient to state § 1962(a) and (b) claims in *Schreiber,* 806 F.2d at 1396–98. NMEC's efforts to direct the Court to matters outside the pleadings to show that it received no benefit from the activities alleged are premature. The Court will not consider such evidence on a motion to dismiss in this complex case. NMEC also contends that it cannot logically acquire an interest in itself as required by the statutes. This argument is flatly contradicted by *Schreiber.* " 'Logic dictates that a corporation, receiving income from a pattern of racketeering in which it has participated as principal, can invest that income in its 'own operations.' " *Id.* at 1398 (quoting *Pennsylvania v. Derry Constr. Co.,* 617 F.Supp. 940, 943 (W.D.Pa.1985)).

NMEC next argues that B of A's § 1962(a) and (b) claims must fail because it fails to allege any injury caused by conduct violative of those subsections. This is

the same argument made by Michael and Feldman against the Savings Banks and is rejected for the reasons set forth therein. *See PART ONE,* II.B, *supra.*

Defendants raise several arguments in opposition to the RICO claims generally. NMEC and West Pac argue that the Bank has not alleged an "injury" by reason of a RICO violation because it admits that the payments it made to the Investor Institutions were voluntary. This is an issue of causation, which the Court has refused to decide on these motions to dismiss. *NMEC,* 636 F.Supp. at 1157. NMEC and West Pac raise another issue that was determined in the Court's earlier ruling. They assert that the Bank had "complete involvement" in the RICO violation and thus is precluded from recovering damages for itself or as the Investor Institutions' assignee. This is an affirmative defense that raises factual issues that cannot be determined on these motions. *See id.* at 1156 n. 25.

Defendants argue that the Investor Institutions suffered no "injury" under RICO because they had their claims paid off in full by the Bank; thus, the Investor Institutions had nothing to assign. The Court has already ruled that the Investor Institutions' claims were assignable. *Id.* at 1151. That ruling is the law of the case and will not be reconsidered here. NMEC's argument that the Bank has failed adequately to allege specific intent to commit the predicate acts and West Pac's argument challenging the particularity of the predicate act allegations fail for the same reason. *See NMEC,* 636 F.Supp. at 1157, 1159.

■■■ On the first round of motions to dismiss, the Court ruled that B of A had adequately pleaded a pattern of racketeering activity. *Id.* at 1157. Adelman, however, contends that no pattern has been alleged as to him. The Bank is not required to allege facts showing that Adelman, who is charged with the RICO conspiracy under § 1962(d), personally participated in or agreed to commit two predicate

**37.** Adelman argues that the fraud/conspiracy to defraud claim must be dismissed as to him for a similar reason—his participation was too limited. As the allegations of ¶¶ 77–81 of the Second Amended Complaint show, this argument is also without merit.

offenses. *See United States v. Tille*, 729 F.2d 615, 619 (9th Cir.), *cert. denied*, 469 U.S. 845, 105 S.Ct. 156, 83 L.Ed.2d 93 (1984) ("Proof of an agreement the objective of which is a substantive violation of RICO (such as conducting the affairs of an enterprise through a pattern of racketeering) is sufficient to establish a violation of section 1962(d)."). Proof of agreement in RICO conspiracy cases "can, and often is, based on inferences drawn from circumstantial evidence." *United States v. Neapolitan*, 791 F.2d 489, 506 (7th Cir.1986). The Bank's Second Amended Complaint alleges several facts from which Adelman's agreement to conspire may be inferred. *See* ¶¶ 16, 43, 77(a)-(c), 78–81, 93(b), (c) and (q).

■ Finally, NMEC and Feldman contend that the Bank's RICO claims are barred by the statute of limitations. Defendants' argument is clearly foreclosed by the Supreme Court's recent decision in *Agency Holding Corp. v. Malley-Duff & Assoc., Inc.,* — U.S. —, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987), holding that the Clayton Act's four-year statute of limitations governs civil RICO actions. Even assuming, as defendants argue, that the Bank had notice of its claim based on Advance's December, 1982, letter resigning as servicer, the Bank's commencement of this action on March 1, 1985, was clearly timely.

## III. THE SINGLE SATISFACTION RULE AND BREACH OF CONTRACT

In its First Amended Complaint, B of A, as the assignee of the Investor Institutions, alleged a breach of contract claim against NMEC. In its motion to dismiss, NMEC argued that the single satisfaction rule barred the assignment of the breach of contract claim. In its opposition to the motions to dismiss its First Amended Compalint and at the oral argument, B of A asked for leave to amend to state direct claims against NMEC for breach of contract, which the Court granted. B of A apparently has chosen not to amend this claim. Nonetheless, the Court concludes that the single satisfaction rule does not

apply to breach of contract claims. *See PART ONE*, I, *supra;* Cal.Civ.Code § 1543; *Tucker v. Nicholson*, 12 Cal.2d 427, 430, 84 P.2d 1045 (1938).

## IV. MOTIONS TO STRIKE

■ NMEC and Feldman raise several objections to various allegations of the Bank which are essentially the same objections they make to the Savings Banks' allegations. These motions to stike are wholly without merit.

Defendants object to the plaintiffs' references to Feldman's prior criminal conviction because he has not put his character in issue. This argument is wholly frivolous. Plaintiffs allege Feldman's conviction as a material fact that Feldman failed to disclose to investors in violation of the securities laws. NMEC and Feldman's similar objections to the references to Feldman's "misleading" testimony, the Van Kampen pools and Advance's letter outlining the problems with the NMEC pools are similarly misplaced. These facts are alleged in support of plaintiffs' claims, as they are fully entitled to do. Finally, NMEC and Feldman accuse plaintiffs of improperly using the terms "securities" and "investor institutions," arguing that the Court has not yet decided whether these certificates are securities and that plaintiffs are trying to "infect" these proceedings with a presumption that the certificates are in fact securities. This argument also is frivolous; the Court is immune from "infectious presumptions" and it is premature to determine what properly should be placed before the jury.

*PART THREE:* CONCLUSION AND ORDER

IT IS ORDERED:

A. With respect to the motions to dismiss the First Amended Complaints of the Savings Banks:

1. First Federal and Missouri's First, Second, Sixth, Eleventh, Fifteenth and Nineteenth Claims for Relief are DISMISSED WITH PREJUDICE.

2. Riverhead's Eleventh and Seventeenth Claims for Relief are DISMISSED WITH PREJUDICE.

3. Defendants' Motion to Strike the request for injunctive relief pursuant to 18 U.S.C. § 1964(a) in First Federal, Missouri and Riverhead's Fourth and Fifth Claims for Relief and in the Prayer for Relief on said claims is GRANTED.

4. Defendants' motions are DENIED in all other respects.

5. The Savings Banks' motion for leave to join Manufacturers Hanover as a defendant is DENIED.

B. With respect to the motions to dismiss the Second Amended Complaint of Bank of America:

1. The Bank's claims for *total* equitable indemnity in Claims Four through Nine are DISMISSED WITH PREJUDICE. The motions to dismiss are DENIED as to the Bank's request for *partial* equitable indemnity on Claims Four and Six through Nine.

2. The Bank's Fifth Claim for equitable indemnity based on defendants' violations of § 17(a) of the 1933 Act is DISMISSED WITH PREJUDICE, since defendants could not be held liable on such a claim in a private action.

3. Defendants' motions, including the motions to strike, are DENIED in all other respects.

C. Leave to further amend is DENIED as to all plaintiffs.

D. All moving defendants who have not yet done so are granted 30 days from the date of this Order within which to file and serve their respective Answers to the remaining allegations of the Savings Banks' First Amended Complaints and Bank of America's Second Amended Complaint.