615 F.2d 857
 Alice C. GEE, as Executrix of the Will of Tom B. Gee, and
Alice C. Gee, Individually, Plaintiff-Appellant,
v.
TENNECO, INC., as Successor to Heyden Newport Chemical
Corporation and Does I through X, inclusive,
Defendant-Appellee.
 No. 78-3168.
 United States Court of Appeals,
Ninth Circuit.
 March 26, 1980.
 
 David Jaroslawicz, New York City, argued for plaintiff-appellant; David H. Greenberg, Beverly Hills, Cal., Julien & Schlesinger, P. C., New York City, on the brief.
 Dov M. Grunschlag, Steinhart, Falconer & Morgenstein, San Francisco, Cal., argued for defendant-appellee; Joseph T. C. Hart, Fulton, Duncombe & Rowe, New York City, on the brief.
 Appeal from the United States District Court for the Northern District of California.
 Before WALLACE and ANDERSON, Circuit Judges, and SOLOMON,* Senior District Judge.
 J. BLAINE ANDERSON, Circuit Judge:
 
 
 1
 Plaintiff Alice C. Gee appeals from the granting of summary judgment in favor of defendant Tenneco, Inc. on Gee's complaint against Tenneco for the wrongful death of her husband, Tom B. Gee, and for other claims arising from his death. We affirm in part and reverse in part.
 
 I. JURISDICTION
 
 2
 The district court's jurisdiction over this matter was based on diversity of citizenship. 28 U.S.C. § 1332. Jurisdiction on appeal derives from our jurisdiction over appeals from final decisions of the district courts. 28 U.S.C. § 1291.
 
 
 3
 We note initially an issue of timeliness in the filing of Gee's Notice of Appeal. The district court's Order Granting Motion for Summary Judgment was filed on July 10, 1978. Gee's Notice of Appeal was received by the district court clerk's office on August 7, 1978, but the filing fee was not paid until August 16, 1978. Where a notice of appeal is physically placed in the hands of the clerk's office within the prescribed time limit for filing, but the fee is not paid and filing does not take place until the limit expires, the notice may be treated as timely. See, e. g., Halfen v. United States, 324 F.2d 52 (10th Cir. 1963). We treat Gee's Notice of Appeal accordingly.
 
 II. STANDARD OF REVIEW
 
 4
 Summary judgment, under Fed.R.Civ.Pro. 56(c), is rendered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In reviewing a grant of a motion for summary judgment, the court on appeal must draw all possible inferences from the record in favor of the non-moving party. See, e. g., Ruffin v. County of Los Angeles, 607 F.2d 1276, 1279, (9th Cir. 1979).
 
 
 5
 In the present case, defendant Tenneco included with its Motion for Summary Judgment an affidavit by George S. Flint, Assistant Secretary of Tenneco, Inc., and the Vice President, Secretary and General Counsel of Tenneco's subsidiary, Tenneco Chemicals, Inc., and also included various exhibits. Gee filed a brief in opposition to Tenneco's motion, but filed no affidavits containing factual allegations contrary to those found in the Flint affidavit. In opposing a motion for summary judgment, a party normally must come forward with allegations demonstrating a factual dispute which calls for a trial. However, where the material submitted by the moving party is insufficient or demonstrates on its face genuine issues of material fact, the non-moving party need not file any affidavits or other supporting material. See, e. g., Adickes v. S.H. Kress & Co., 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); Sherman v. British Leyland Motors, Ltd., 601 F.2d 429, 439 (9th Cir. 1979).
 
 
 6
 In the absence of contravening affidavits from Gee, our task on this appeal is to determine whether the affidavit and documents submitted by Tenneco raise a genuine issue of material fact, and whether Tenneco is entitled to judgment as a matter of law.III. BACKGROUND
 
 
 7
 The material facts in this appeal mainly involve the corporate evolution of Tenneco and raise issues of the liability of successor corporations for torts committed by their predecessors. We here set out facts which are largely undisputed. The nuances and inferences which the parties urge upon us are discussed at length later in this opinion.
 
 
 8
 In 1944, while serving in the Armed Forces, plaintiff's decedent, Tom B. Gee, was given a substance known as "Thorotrast,"[1] a contrast dye material used for X-ray purposes. According to the allegations in Gee's complaint, the Thorotrast dosage eventually caused her husband to contract a malignant tumor, and his death resulted on August 28, 1976.
 
 
 9
 Thorotrast was manufactured and sold by Heyden Chemical Corporation, a New York corporation, beginning some time in the early 1930's. Following a consolidation in 1943, Heyden Chemical Corporation became a Delaware corporation. Heyden Chemical continued the manufacture and sale of Thorotrast through its antibiotic division until 1953, when the antibiotic division and its assets were sold to American Cyanamid Company, a Maine corporation. Pursuant to the terms of the sales agreement between Heyden and American Cyanamid, Heyden agreed to indemnify Cyanamid against claims arising from the operation of the antibiotic division prior to December 1953. Sometime in 1954, Cyanamid sold the Thorotrast business to the Testagar division of the Fellows Medical Manufacturing Company, Inc. of Detroit, Michigan.
 
 
 10
 Heyden continued to do business following the sale of the antibiotic division, though it ceased the manufacture and sale of Thorotrast. In 1957 Heyden changed its name to Heyden Newport Chemical Corporation.
 
 
 11
 In October 1963, HDN Corporation, a Delaware corporation, entered into an agreement whereby HDN acquired all of the assets of Heyden, a transaction whose precise classification is a matter of dispute between the parties. Upon completion of the transfer of its assets to HDN, Heyden changed its name to Denport Corporation, and was subsequently dissolved. HDN thereupon acquired the name "Heyden Newport Chemical Corporation," which was changed two years later to "Tenneco Chemicals, Inc." Tenneco Chemicals, Inc. is a subsidiary of Tenneco, Inc., formerly Tennessee Gas Transmission Company.
 
 
 12
 The consideration received by Heyden Newport for the 1963 transaction with HDN consisted solely of a certain number of shares of common stock in Tennessee Gas Transmission to be delivered to Heyden and promptly distributed to the shareholders of Heyden upon surrender of their certificates of stock in the dissolved corporation.
 
 
 13
 Heyden, HDN, and Tennessee Gas Transmission memorialized the 1963 agreement in a document labeled a "Plan of Reorganization," included with Tenneco's summary judgment motion as Exhibit 2. The Plan of Reorganization contained a number of provisions dealing with HDN's assumption of Heyden Newport's pre-1963 liabilities. Each of these provisions is discussed at greater length later in this opinion.
 
 
 14
 There is apparently no dispute that neither HDN, the second Heyden Newport Chemical Corporation, Tenneco Chemicals, Inc., nor Tenneco, Inc., has ever engaged in the manufacture or sale of Thorotrast. Gee has advanced several theories, however, in favor of imposing liability upon Tenneco for her husband's wrongful death. Gee argues that HDN and Tennessee Gas Transmission expressly assumed Heyden Newport's liabilities in the 1963 Plan of Reorganization, and argues further that certain theories of corporate successor liability impose liability here in any event. Gee also urges that we find as a matter of law that Tenneco had a duty to warn her husband of Thorotrast's dangers.IV. DISCUSSION
 
 
 15
 A. Conflicts of Law and Discovery of the Applicable Law
 
 
 16
 The court below, sitting as a federal district court in a diversity action, was obliged to apply the substantive law of the state in which it sat, including the state's choice-of-law rules. Klaxon Co. v. Stentor Electric Manufacturing Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941).
 
 
 17
 Tenneco here argues that a conflict exists between the laws of Delaware and California on the question of the liability of a corporate successor for the torts of its predecessor. California, the forum state here, follows a variation on the governmental interest analysis approach to resolving conflicts of law known as the "comparative impairment" analysis. See Offshore Rental Company, Inc. v. Continental Oil Co., 22 Cal.3d 157, 583 P.2d 721, 148 Cal.Rptr. 867 (1978); Bernhard v. Harrah's Club, 16 Cal.3d 313, 546 P.2d 719, 128 Cal.Rptr. 215, cert. denied, 429 U.S. 859, 97 S.Ct. 159, 50 L.Ed.2d 136 (1976). While we are inclined to believe that California courts would apply California law in this case, we find it unnecessary to so decide here.
 
 
 18
 Tenneco urges the application of Delaware law on certain issues; however, we find in favor of Tenneco on those issues even if California law be applied. Consequently, we assume the applicability of California's substantive law on successor liability, unless otherwise indicated.
 
 
 19
 In ascertaining the law of California, we are guided by certain well-established principles. The task of a federal court in a diversity action is to approximate state law as closely as possible in order to make sure that the vindication of the state right is without discrimination because of the federal forum. Douglass v. Glenn E. Hinton Investments, Inc., 440 F.2d 912, 915 (9th Cir. 1971). In cases where the highest appellate court of the state has not spoken, well-considered dicta should not be ignored. See, e. g., Rocky Mountain Fire & Casualty Company v. Dairyland Insurance Company, 452 F.2d 603, 604 (9th Cir. 1971); Priest v. American Smelting & Refining Co., 409 F.2d 1229, 1232 (9th Cir. 1969); United States Fidelity & Guaranty Co. v. Anderson Construction Co., 260 F.2d 172, 176, n.17 (9th Cir. 1958).
 
 
 20
 On appeal, we are limited in our review of the district court's interpretation of the law of the state in which it sits. We do not overrule a district judge on the question of state law unless the judge's findings are "clearly wrong." See, e. g., Scandinavian Airlines v. United Aircraft, 601 F.2d 425, 427 (9th Cir. 1979). While this circuit does not regard the district judge's presumed expertise in the law of his or her own state to be infallible, cf. Holcomb Construction Co. v. Armstrong, 590 F.2d 811 (9th Cir. 1979); Priest v. American Smelting & Refining, supra, we nonetheless regard the standard of review on this issue as one which does restrict our scrutiny of the district judge's determination.
 
 B. The American Cyanamid Transaction
 
 21
 Our review of the district court's determinations is complicated by the terseness of the court's single sentence order granting summary judgment. While we may surmise that the court rejected each of Gee's arguments in favor of liability, we remain unsure of the basis of the order in other respects. We are particularly unclear on how the court viewed the significance of Heyden's sale of the antibiotic division in 1953 to American Cyanamid.
 
 
 22
 Tenneco argued below that liability passed to American Cyanamid when it purchased the antibiotic division, and, therefore, that Heyden retained no liability to be passed along in 1963 when it sold out to HDN and Tennessee Gas Transmission.[2] Tenneco appeared to back off somewhat in arguing this appeal, citing the American Cyanamid transaction mainly as evidence of Tenneco's lack of intent to assume responsibility for Heyden's pre-1953 liabilities.[3]
 
 
 23
 To the extent that the judgment below may have been based upon a finding that the sale of the antibiotic division to American Cyanamid relieved Heyden of potential liability for Gee's injuries, which might be passed on to Tenneco, it must be reversed. We are aware of no rule of law which allows a corporate entity to evade liability for its tortious conduct merely by selling the instrumentality which is alleged to have caused the injury, and none has been cited to us in this appeal. It is the general rule that where a corporation is not dissolved following a sale of assets or a reorganization, it remains liable for debts and liabilities incurred by it, unless it is otherwise agreed between the corporation and its creditors. See 15 W. Fletcher, Cyclopedia of the Law of Private Corporations § 7348 (rev. perm. ed. 1973), and cases cited therein. In the absence of citation to any persuasive California authority, we must find that an interpretation of the law of that state which allows Heyden to escape liability in this instance would be "clearly wrong."[4]
 
 
 24
 We find it unnecessary to address the question of the legal effect of the provision of the agreement whereby Heyden agreed to indemnify American Cyanamid for all liabilities arising from the operation of the antibiotic division prior to the sale.[5] The court below is free to consider the issue should it arise in the course of the proceedings following remand.
 
 
 25
 C. Express or Implied Assumption of Liability
 
 
 26
 Gee argues that a genuine issue of material fact exists whether HDN and Tennessee Gas Transmission expressly or impliedly assumed liability for Heyden's liability in the 1963 Plan of Reorganization. Giving Gee, as the non-moving party, all reasonable inferences from the record, we agree that Tenneco's documents raise a genuine issue here, and we reverse.
 
 
 27
 The Plan of Reorganization, submitted as Exhibit Two accompanying Tenneco's Motion for Summary Judgment,[6] contains a number of provisions pertaining to Heyden's preexisting liabilities and HDN's assumption of them. Paragraph 1.6 of the Plan embodied an agreement between the parties that all liabilities of Heyden were to be detailed in an attached Consolidated Balance Sheet, and that Heyden had incurred no liabilities which were not reflected in the balance sheet.[7] The balance sheet and other attachments to the Plan of Reorganization do not reflect any outstanding liability arising from the manufacture of Thorotrast. Tenneco argues that Paragraph 1.6 made HDN's assumption of liability expressly contingent upon the listing of such liability in the balance sheet, and that the Plan is susceptible to no other reasonable interpretation.
 
 
 28
 Paragraph 5.3 of the Plan, however, expresses HDN's assumption of liability in broader terms. That article reads:
 
 
 29
 "Subject to the conditions set forth, from and after the Closing Date HDN shall assume and agrees to pay, perform and discharge all debts, obligations, contracts and liabilities of Heyden of any kind, character or description, whether accrued, absolute, contingent or otherwise (and whether or not reflected or reserved against on Heyden's Balance Sheet, books of account and records), all as the same shall exist at the Closing Date and any expenses thereafter incurred by Heyden in connection with its liquidation and dissolution and the redemption of its preferred stocks not elsewhere provided for herein; provided, however, that nothing contained in this paragraph shall relieve Heyden of its obligation under this Plan of Reorganization to distribute the shares of Tennessee common stock to the holders of Heyden's common stock in complete winding up and liquidation of Heyden."[8] (emphasis supplied)
 
 
 30
 It can be reasonably inferred from Paragraph 5.3 that HDN agreed to assume any and all liabilities of Heyden, regardless of the contents of the Consolidated Balance Sheet or other attachments. Paragraph 1.6 does not expressly limit HDN's assumption of liability, but merely affirms that all known liabilities were reflected on the balance sheet. We do not exclude the possibility that Tenneco's view of the Plan may prevail before the trier of fact. In reviewing a summary judgment, however, we have no choice but to reverse where we find the moving party's papers to be reasonably susceptible to conflicting interpretations. Accordingly, we reverse the grant of summary judgment on this issue and remand for further proceedings.
 
 D. De Facto Merger and Goodwill Liability
 
 31
 Gee argues that Tenneco's liability as a successor corporation can be further established, apart from the Plan of Reorganization, as a matter of law under applicable California decisions dealing with successorship liability in products liability actions. There appears to be no issue of fact raised, and we review here strictly on the issue whether Tenneco was entitled to judgment as a matter of law. To the extent that the judgment below may have been based upon Gee's failure to establish liability on this basis, we affirm.
 
 
 32
 Two recent California appellate decisions supply the applicable principles of law. In Ray v. Alad Corp., 19 Cal.3d 22, 560 P.2d 3, 136 Cal.Rptr. 574 (1977), the California Supreme Court considered the question of the liability of a successor corporation for the negligently manufactured product of its predecessor. Rawlings v. D. M. Oliver, Inc., 97 Cal.App.3d 890, 159 Cal.Rptr. 119 (1979), a California Court of Appeal decision, further amplified the doctrines set forth in Ray v. Alad Corp., supra.
 
 
 33
 California applies the general rule that a corporation which purchases the principal assets of another does not assume the liability of the selling corporation unless (1) there is an express or implied agreement of assumption of liability, (2) the transaction amounts to a consolidation or merger of the two corporations, (3) the purchasing corporation is a mere continuation of the seller, or (4) the transfer of assets to the purchaser is for the fraudulent purpose of escaping liability. Ray v. Alad Corp., supra, 136 Cal.Rptr. at 578, 560 P.2d at 7. In Ray v. Alad Corp., the California Supreme Court created, in effect, a fifth exception to the general rule which imposes liability under certain circumstances for the manufacture of defective products.
 
 
 34
 The facts of Ray v. Alad Corp. are critical to its understanding. The plaintiff there was injured while using a defective ladder manufactured by the first Alad Corp. (Alad I). Prior to plaintiff's injury, Alad I had sold its inventory, equipment, trade name and goodwill to the Lighting Maintenance Corporation, which then took the name "Alad Corporation" (Alad II). Alad I dissolved shortly thereafter. Alad II, as a result of the transaction, acquired Alad I's plant, machinery, offices, and all other assets necessary to continue the manufacture of Alad ladders. Alad II, using essentially the same factory and office personnel, continued to manufacture the identical model of ladder which had injured the plaintiff. There was little or no indication to the general public that a different entity was manufacturing the line of ladders.
 
 
 35
 In determining that liability should be imposed upon Alad II for the plaintiff's injuries, the California Supreme Court focused upon three factors: (1) the destruction of plaintiff's remedies against the original manufacturer, (2) the successor's ability to assume the original manufacturer's risk-spreading role, and (3) the fairness of requiring the successor to assume responsibility for the predecessor's defective products because the burden necessarily runs with the successor's enjoyment of the predecessor's goodwill. 136 Cal.Rptr. 574, 560 P.2d 3, 9. The rationale of Ray v. Alad Corp. is consistent with California's strict liability policy of assigning responsibility for injuries arising from the manufacture of defective products to the enterprise which has received the benefit of doing business in a particular line of products, and which is in the best position to spread the cost of the injury among members of society. See generally Greenman v. Yuba Power Products, Inc., 59 Cal.2d 57, 377 P.2d 897, 27 Cal.Rptr. 697 (1963).
 
 
 36
 The California Court of Appeal has broadened the Ray v. Alad Corp. rule of successorship liability somewhat in Rawlings v. D. M. Oliver, Inc., supra. The defendant corporation in Rawlings had purchased the assets and trade name of a corporation which had manufactured industrial kelp dryers according to the customer's specifications. Because the dryers were a more or less customized product, the predecessor had ceased to manufacture that precise line of product. When the successor purchased the predecessor's plant, it continued the same general line of business. The Rawlings court found that failure to continue manufacturing the identical product did not remove the case from the Ray v. Alad Corp. rule and imposed liability upon the successor when an employee of the customer who had purchased the dryers from the predecessor was injured while operating one on the job. The court justified successorship liability by noting the following factors:
 
 
 37
 "Oliver bought a going business including its good will and continued that business at the same location under the same fictitious name as its predecessor. Where one takes the benefit one ordinarily should bear the burden. . . . Oliver, unlike plaintiff, was in a position to protect itself from loss by expressly providing for that risk in the bargain it made with sellers. Even now, by cross-complaining for indemnity, Oliver can transfer the economic burden to the responsible party."
 
 
 38
 97 Cal.App.3d 890, 901, 159 Cal.Rptr. 119, 124. It should also be noted that Rawlings came on appeal from the granting of summary judgment in favor of defendant, and that defendant's allegation that the particular product line was no longer being manufactured was not supported by the record. Id.
 
 
 39
 Our analysis here is again restrained by application of the "clearly wrong" standard to the district judge's interpretation of the law of the state in which he sits. After careful consideration of Ray v. Alad Corp. and Rawlings v. D. M. Oliver, we cannot say that the district court was clearly wrong in concluding that, under California law, Tenneco was entitled to judgment on this issue.
 
 
 40
 Though Rawlings makes clear that continuation of the precise product line is not an absolute prerequisite to liability under the Alad Corp. exception, it does not alter Alad's fundamental requirement that the successor receive the benefit of the continuation of the predecessor's business and goodwill. In this case, HDN received the benefit of Heyden's general goodwill, but did not receive the benefit of any accrued goodwill in any line of business related to the sale of Thorotrast. Not only had Heyden ceased the manufacture of Thorotrast and sold the right to manufacture that product to a third party, it had also sold off the entire division which manufactured related products. The district judge would not have been clearly wrong in determining that a California court would find the imposition of liability upon Tenneco fundamentally unfair under these circumstances. Our view of the ideal result in this case is irrelevant.
 
 
 41
 Gee has also urged that the 1963 transaction constituted a "de facto merger" under dicta found in Ray v. Alad Corp. In determining that Alad II's purchase of Alad I's assets and goodwill did not amount to a "consolidation or merger" so as to invoke that exception to the general rule of no successorship liability, the court in Alad made the following observation:
 
 
 42
 "This exception has been invoked where one corporation takes all of another's assets without providing any consideration that could be made available to meet claims of the other's creditors . . . or where the consideration consists wholly of shares of the purchaser's stock which are promptly distributed to the seller's shareholders in conjunction with the seller's liquidation (Shannon v. Samuel Langston Company (W.D.Mich.1974), 379 F.Supp. 797, 801)."
 
 
 43
 136 Cal.Rptr. 574, 578, 560 P.2d 3, 7.
 
 
 44
 According to the Recitals preceding the body of the Plan of Reorganization, the "sole consideration" for HDN's purchase of Heyden's assets was the delivery of shares of common stock in Tennessee Gas Transmission to Heyden for immediate distribution to the shareholders of Heyden. It would appear that the transaction falls within the de facto merger doctrine. If such is the law of California, then summary judgment was improperly granted on this point.
 
 
 45
 The reference in Alad Corp. to the rule in Shannon v. Samuel Langston can fairly be characterized as dicta. The rule is quoted merely to exemplify the type of showing which had been required in other jurisdictions to prove a de facto merger or consolidation. The discussion then proceeds to the adequacy of consideration involved in the Alad Corp. transaction. We have been referred to no other California cases dealing with a de facto merger and the question of stock in the purchasing corporation as sole consideration for the assets of the acquired corporation.
 
 
 46
 We reiterate that we overturn the district judge's interpretation of state law only if it is "clearly wrong." Our interpretation of state law, were we to sit de novo, has no bearing on the disposition of this issue.
 
 
 47
 While the de facto merger rule cited in Alad Corp. possibly represents the majority trend, it is by no means universally accepted. See 15 Fletcher, Cyclopedia of the Law of Private Corporations § 7127 (rev. perm. ed. 1973), and cases cited therein. The rule represents a policy determination that where the shareholders of the acquired corporation receive shares in the acquiring corporation, the practical effect as if the corporations have merged, and that liability should be apportioned accordingly.
 
 
 48
 We heed the general principle that "well-considered dicta " should be considered in determining the law of the forum state. We do not, however, find that the offhand reference to Shannon in Alad requires that we hold the district judge's contrary view to be clearly wrong. Had Alad presented us with a more thoughtful consideration of the question and a stronger indication of how a California court would lean, we might be persuaded otherwise. Keeping in mind our standard of review, however, we affirm the granting of summary judgment on this issue.
 
 E. Duty to Warn
 
 49
 Gee's final theory of liability is that Tenneco, apart from liability purely as a successor, acquired an independent duty to warn of the potential dangers of Thorotrast after receiving notice of them. Tenneco has been sued elsewhere for injuries arising from the use of Thorotrast, and has arguably been on notice of the chemical's tendency to cause serious disease since 1968, and probably longer. See Thrift v. Tenneco Chemicals, Inc., Heyden Division, 381 F.Supp. 543 (N.D.Tex.1974); Prince v. Trustees of University of Pennsylvania, 282 F.Supp. 832 (E.D.Pa.1968). Gee argues that once Tenneco became aware that Thorotrast was capable of causing such injuries, it acquired a duty to warn those who had received dosages of the substance.
 
 
 50
 Neither party has cited us to any California law bearing on the precise issue of a successor corporation's duty to warn of defects in products manufactured by a predecessor. It is appropriate, therefore, that we examine precedents elsewhere in order to determine whether the district judge accurately approximated California law. Again, we surmise that the district court found that California law imposes no duty to warn under these circumstances. We conclude that such a finding was not clearly wrong.
 
 
 51
 It is clear that a successor corporation may acquire an independent duty to warn where defects in a predecessor's products come to its attention. See Leannais v. Cincinnati, Inc., 565 F.2d 437 (7th Cir. 1977); Shane v. Hobam, Inc., 332 F.Supp. 526 (E.D.Pa.1971); Wilson v. Fare Well Corp., 140 N.J.Super. 476, 356 A.2d 458 (1976). It is equally clear, however, that succession alone does not impose a duty to warn of recently-discovered defects. See Travis v. Harris Corp., 565 F.2d 443 (7th Cir. 1977); Chadwick v. Air Reduction Company, 239 F.Supp. 247 (N.D.Ohio 1965).
 
 
 52
 A common thread running through decisions imposing a duty to warn upon a successor corporation has been the continuation of the relationship between the successor and the customers of the predecessor. In Shane, and Fare Well Corp., both supra, the successor had inherited service contracts which included responsibilities for servicing the allegedly defective product. In Leannais, supra, the court reversed a summary judgment in the successor's favor and remanded for determination whether the successor had assumed the predecessor's service contract, among other issues. The rationale of these decisions is consistent with a benefit/burden analysis, and also imposes a burden which the manufacturer can realistically bear.
 
 
 53
 In Travis v. Harris Corp., supra, the Seventh Circuit declined to impose a duty to warn where evidence of a continuing relationship between customer and successor was lacking. Citing its earlier decision in Leannais, the court noted that:
 
 
 54
 "Succession to a predecessor's service contract, coverage of the particular machine under a service contract, service of that machine by the purchaser corporation, a purchaser corporation's knowledge of defects and of the location or owner of that machine, are factors which may be considered in determining the presence of a nexus or relationship effective to create a duty to warn."
 
 
 55
 565 F.2d at 449.
 
 
 56
 In the present case, the last contact with Thorotrast that any corporation in Tenneco's family tree had maintained occurred no later than 1953. There are no facts in the record to indicate that Heyden, HDN, or Tenneco had any relationship with users of Thorotrast, or that any continuing benefit was derived from the use of Thorotrast. There is nothing to indicate that Gee's decedent had any contact with the Tenneco corporate chain following his use of Thorotrast in 1944. The record is simply devoid of evidence of the factors to which courts have looked in determining a duty to warn.
 
 
 57
 On this record, we cannot say that the district judge was clearly wrong in finding no duty to warn. Even the more plaintiff-oriented decisions in this area do not compel the imposition of a duty here. In the absence of a more substantial relationship between Tenneco and Thorotrast, we believe that a California court would not find a duty to warn in this case.
 
 V. CONCLUSION
 
 58
 With regard to the issues of Heyden's liability following the 1953 sale to American Cyanamid, and of HDN's express or implied assumption of liability in the 1963 Plan of Reorganization, the grant of summary judgment is reversed. With regard to all other issues discussed herein, the granting of summary judgment is affirmed.
 
 
 59
 Judgment AFFIRMED in part, and REVERSED and REMANDED in part for further proceedings not inconsistent with this opinion.
 
 
 
 *
 The Honorable Gus J. Solomon, Senior United States District Judge, District of Oregon, sitting by designation
 
 
 [1]
 Thorotrast is also known as "Umbrathor." For the sake of convenience and clarity, we hereafter refer only to Thorotrast
 
 
 [2]
 Brief in Support of Motion for Summary Judgment, Clerk's Record (hereafter "C.R."), p. 30
 
 
 [3]
 Brief of Appellees, p. 9
 
 
 [4]
 Article XIII of the Sales Agreement between Heyden and American Cyanamid provides that it shall be interpreted according to the law of the State of New York (C.R. 64). While this provision may be binding as between the parties to the agreement, we do not believe that a California court would impose its dictates upon a stranger to the transaction. Accordingly, we speak here in terms of California law
 
 
 [5]
 Article V (B) (C.R. 60)
 
 
 [6]
 C.R. 65-83
 
 
 [7]
 Paragraph 1.6 reads as follows:
 "Except as listed in the schedule which Heyden has heretofore delivered to HDN and Tennessee, at March 31, 1963 neither Heyden nor any of the Subsidiaries had any liabilities, absolute or contingent (other than inter-company liabilities), which are not shown or provided for on the unaudited Consolidated Balance Sheet of Heyden and the Subsidiaries as of March 31, 1963 annexed as part of Exhibit B hereto, and none of the Affiliates the balance sheet of which is referred to in paragraph 1.5 hereof had as of the date of such balance sheet any material liabilities, absolute or contingent, which are not shown or provided for on such balance sheet." C.R. 66.
 
 
 [8]
 C.R. 74