[No. B105686. Second Dist., Div. Seven. May 7, 1997.]

SKIP WRIGHT et al., Plaintiffs and Appellants, v.
STANG MANUFACTURING COMPANY et al., Defendants and
Respondents.

1220

**COUNSEL**

Effres & Bryman and Andrew C. Bryman for Plaintiffs and Appellants.

Chapman & Glucksman, Arthur J. Chapman, Rita M. Miller, Stephens, Berg & Lasater and Joseph F. Butler for Defendants and Respondents.

## OPINION

**LILLIE, P. J.**—In this product liability action, plaintiff Skip Wright, a firefighter employed by the City of Glendale, was injured when a "deck gun" or water cannon mounted on a firetruck broke loose while under pressure from the water pump, throwing Wright in the air and onto the ground with the deck gun landing on him. Plaintiffs appeal from summary judgment granted in favor of defendants, collectively referred to herein as Stang, the alleged successors of the corporation which manufactured the deck gun. The issues on appeal are whether the trial court correctly determined that "There is no evidence provided that the deck gun was defective. The piece of pipe that disengaged was not part of the deck gun and was requested and installed by another party. . . . [T]here is no duty to warn regarding a 17 year old component part that was not defective."

### FACTUAL AND PROCEDURAL BACKGROUND

On November 14, 1994, plaintiff Skip Wright filed a complaint against Stang, among others, for negligence, strict liability, and breach of warranties; plaintiff Debbie Wright asserted a claim for loss of consortium. The complaint alleged that while Skip Wright was in the course and scope of his employment as a firefighter for the City of Glendale on November 15, 1993, he was using a Stang Manufacturing Company deck gun attached to a Seagrave fire engine; the deck gun broke loose and failed while under pressure, throwing him into the air and onto the ground, with the deck gun landing on him.

The most comprehensive evidence in our record setting out the details of the accident is provided by the declaration of Ralph Craven (Craven), plaintiffs' expert consultant who is a fire apparatus expert and president of the National Institute of Emergency Vehicle Safety; Craven inspected the fire engine involved in the incident herein, including the deck gun and the riser to which it was attached; he also viewed a videotape of the incident that resulted in plaintiff's injuries. According to Craven, water was being supplied to the deck gun from a water tank on the fire truck; when the water supply was exhausted, a hydrant connection was made and the engineer on the fire truck activated a valve that allowed the water to flow through the pump directly to the deck gun; the pump revolutions were high and the water pressure generated a nozzle reaction, known in the industry as a "water hammer." A water hammer occurs when water is rapidly turned on and off, causing force to be generated which is more than four to six times the applied force; a nozzle reaction occurs, which, in turn, causes reactionary forces on the attachments, including the riser, to which the deck gun was attached with a three-inch threaded riser pipe. In this case, the threaded riser

pipe did not fail or break at its connection with the deck gun, but the riser broke at the point it was mounted on the fire truck. In Craven's opinion, "the deck gun and its attachments separated from the fire truck mounting, thereby causing the plaintiff's injuries, as a result of this nozzle reaction combined with the absence of a flange mounting system and the presence of corrosion on the riser that was used in place of flanges, as well as inadequate thread depth engagement on the riser pipe, and the fact that the riser was made out of material of insufficient strength."

The deck gun apparently was manufactured in 1977 by Stang Hydronics; the successor to Stang Hydronics is defendant Stang Enterprises, Inc. For purposes of the summary judgment motion, and this appeal, the Stang defendants provided no evidence to explain the nature of their relationship to Stang Hydronics and they did not provide sufficient evidence to negate the assertion that they are liable as successors to the manufacturer of the deck gun under principles set out in *Ray* v. *Alad Corp.* (1977) 19 Cal.3d 22 [136 Cal.Rptr. 574, 560 P.2d 3].[1] Rather, defendants' summary judgment motion assumed for the sake of the motion only that they are successors to the

---

[1]Robert Green, the president of defendant GST Industries, Inc., presented a declaration stating that in 1989 he purchased a portion of Stang Hydronics from Stang Enterprises, the successor to Stang Hydronics, Inc. The former corporate name of GST Industries, Inc., was Stang Manufacturing, Inc. According to the caption of defendants' pleadings, Stang Manufacturing Co. is a division of Stang Hydronics, Inc.

In light of the issues raised below, and the state of the record, we need not further address the issue of the relationship of the Stang defendants to the manufacturer of the deck gun, Stang Hydronics. According to plaintiffs' opposition to the summary judgment motion, defendants had previously moved for summary judgment on the ground that they were not successors to the corporation that manufactured the deck gun. We infer that such previous motion was denied or was ultimately unsuccessful. As acknowledged by plaintiffs, in the instant motion for summary judgment before us on this appeal, defendants do not attempt to negate successor liability under principles set out in *Ray* v. *Alad Corp., supra,* 19 Cal.3d 22. Although an entity is not involved in the design, manufacture, or distribution of a product, under a special exception judicially created by the California Supreme Court in *Alad,* it is possible for that entity to be held strictly liable in tort for a defect in a product. (*Stewart* v. *Telex Communications, Inc.* (1991) 1 Cal.App.4th 190, 195 [1 Cal.Rptr.2d 669].) The three factors justifying imposition of liability under *Alad* are (1) the virtual destruction of plaintiff's remedies against the original manufacturer caused by the successor's acquisition of the business, (2) the successor's ability to assume the original manufacturer's risk-spreading role, and (3) the fairness of requiring the successor to assume a responsibility for defective products that was a burden necessarily attached to the original manufacturer's good will being enjoyed by the successor in the continued operation of the business. (1 Cal.App.4th at pp. 195-196.)

Accordingly, even if defendants did not themselves manufacture, design, or sell, etc., the deck gun in this case, they may be liable for injuries caused by a defective product and thus stand in the shoes of the manufacturer, Stang Hydronics, for purposes of imposing liability based on the theory of strict product liability. The *Alad* case thus offers an additional basis for imposition of strict products liability against defendants, in addition to any independent ground based on defendants' own conduct or involvement in the manufacture and distribution of the deck gun. Because of the multiple theories of liability asserted against defendants,

manufacturer of the deck gun, but maintained that (1) there is no evidence that the deck gun was defective because it did not fail, (2) a component part manufacturer is not liable for failure to warn when the final product is subsequently packaged, labeled and marketed by another manufacturer, and (3) defendants as alleged successor corporations to the manufacturer, have no duty to warn.

In support of their motion for summary judgment, defendants asserted, and plaintiffs agreed, that the following facts were undisputed: The three-inch riser pipe remained attached to the deck gun at the time of plaintiff's accident, and the threaded pipe did not shear at its connection with the deck gun; the steel which comprises the deck gun did not fail; according to blue prints, a flange mount system was available and could have been utilized by the City of Glendale. Defendants supported their motion with the declaration of Duane Bergmann, a licensed mechanical engineer, who stated that he inspected the deck gun and riser pipe; the pipe did not fail at the connection point with the deck gun; it was his opinion that the threaded mounting area of the deck gun was adequate; the threaded mounting of the deck gun did not fail, and the material which comprises the deck gun did not fail.

Defendants also asserted that they did not manufacture the deck gun, and had no involvement with it, but plaintiffs disputed those assertions on the ground that the evidence did not establish the relationships among the various defendants, or defendants' relationships with the manufacturer of the deck gun. Thus, plaintiffs maintained that even if it were undisputed that defendants did not manufacture or distribute the deck gun, that fact alone would not entitle them to summary judgment. (See fn. 1, *ante*.)

In opposition to the motion, plaintiffs argued (1) that the fact that the deck gun itself did not fail does not preclude a finding that it was defective based on the lack of sufficient warnings about the proper maintenance of the gun, its attachments, and proper mounting; and (2) a component part manufacturer may be held liable for a failure to warn under the instant circumstances.[2] Plaintiffs' opposition was supported with the declaration of Craven, who

including the successor liability theory, defendants cannot prevail on summary judgment merely by showing that they themselves did not manufacture, etc., the deck gun, a proposition which they claim is established by the declaration of Robert Green. Moreover, defendants did not move in the alternative for summary adjudication of issues. Therefore, if we conclude a triable issue of fact exists as to the products liability cause of action, we must reverse the judgment and need not address the other tort theories of recovery (negligence and breach of warranty) alleged in the complaint.

[2]Defendants below, and on appeal, make a great deal out of the fact that plaintiffs responded "Undisputed" to the following separate statement of fact (No. 7 in defendants' papers, but numbered 8 by plaintiffs, who mixed up the numbers of defendants' separate

stated that based on his inspection of the fire engine and deck gun, his viewing of the videotape of the incident involving plaintiff, and his education and experience, he was of the opinion "that the deck gun and its attachments separated from the fire truck mounting, thereby causing the plaintiff's injuries, as a result of this nozzle reaction combined with the absence of a flange mounting system and the presence of corrosion on the riser that was used in place of flanges, as well as inadequate thread depth engagement on the riser pipe, and the fact that the riser was made out of material of insufficient strength."

Craven further declared that he was of the opinion "that Stang, as the manufacturer and seller of the deck gun, had a duty to warn the user of the deck gun regarding the potential hazards of a water hammer and the nozzle reaction that occurs as a result thereof, which warning must necessarily include a reference to the need for proper inspection and maintenance of the deck gun, including periodic inspection for the presence of corrosion, proper threading of attachments, and use of a flange mounting system or attachments made of industrial heavy steel or other materials that resist corrosion. In this regard, it is foreseeable to anyone familiar with fire apparatus that

statement of facts): "The deck gun manufactured by Stang Hydronics did not cause plaintiff's injuries. A three inch riser pipe was installed on the deck gun. The three inch riser pipe broke. There is no damage to the deck gun itself."

It is clear from plaintiffs' opposition that plaintiffs were not conceding the issues of product defect or causation, although plaintiffs admitted the facts that the riser pipe broke and there was no damage to the deck gun itself. Defendants below and in their brief on appeal, fail to establish that plaintiffs' response to their separate statement of undisputed facts is accorded the same effect as a judicial admission in a pleading. As noted by the court in *Kirby* v. *Albert D. Seeno Construction Co.* (1992) 11 Cal.App.4th 1059, 1066-1067 [14 Cal.Rptr.2d 604]: "In *Price* v. *Wells Fargo Bank* (1989) 213 Cal.App.3d 465 . . . , we explained that a 'summary judgment should not be based on tacit admissions or fragmentary and equivocal concessions, which are contradicted by other credible evidence.' [Citation.] We approved of reliance on admissions made in the course of discovery when they are uncontradicted or contradicted only by self-serving declarations of a party. [Citation.] [¶] Seeno asks us to give conclusive effect to an ambiguous statement in an unverified complaint and to ignore the explanation of the statement contained in deposition testimony under oath. This is precisely what we refused to do in *Price*. When the facts submitted in opposition to a summary judgment motion indicate the existence of a material factual issue, summary judgment should not be entered based on mistaken legal conclusions in the complaint. [Citation.] Summary judgment is also inappropriate where the opposing party submits evidence indicating that a mistake was made."

In light of *Kirby*, it is clear that plaintiffs made a mistake in responding "Undisputed" to that portion of defendants' separate statement that it was undisputed that the deck gun did not cause plaintiff's injuries. Such an assertion contradicts other portions of plaintiffs' response to the separate statement, as well as plaintiffs' own list of nine material facts which they claimed were in dispute, and which they supported with Craven's declaration. Moreover, we fail to see how defendants can rely on the mistaken response to bolster their motion when the response to the separate statement is not evidence because it is not under oath, nor is it verified. Accordingly, we do not consider the mistaken response of plaintiffs as a "judicial admission" or concession on the issues of liability and causation.

water hammer nozzle reactions can occur and that steel components on deck gun attachments have a tendency to rust and corrode through normal use and that this can result in failure of any attachments, including risers like the one used here. In the case of the deck gun in question, Stang did not provide any of the aforementioned warnings and, it is my opinion that, had such a warning been given in this case and the deck gun maintained and inspected in accordance with same, this incident could have been prevented in that the corrosion that was present in the riser would have been detected and replaced before the incident and/or the effects of the water hammer nozzle reaction would have otherwise been reduced. [¶] The subject deck gun should have also been installed with a flange mounting surface due to the effects of water hammers and nozzle reaction on the mounted deck gun such as occurred in this case. . . . [I]f a flange type system had been used, the incident in question here would not have occurred. This is due to the fact that the forces created by the water hammer nozzle reaction would have been adequately distributed so as to be able to handle the forces by distributing the load. This is accomplished by increasing the mounting surface area, thereby decreasing the pounds per square inch of reactionary forces. The flange type system would have also provided a system that allows for easier inspection of the deck gun and all attachments in order to ascertain whether corrosion was present in either the deck or any attachments, including risers."

Craven also concluded that because Stang did not design the deck gun with a flange mounting system, Stang as manufacturer had a duty to inform the installer and user of the deck gun that it must be installed in such a manner to safely handle the forces that would be generated during normal and foreseeable use, including those of water hammers; in this regard, it is the fire department that would necessarily be responsible for maintenance of the deck gun and attachments. In addition, Craven opined, the correct riser pipe was not used, nor was the riser installed with adequate thread depth to provide adequate strength. In this case, steel or galvanized steel pipe was used rather than industrial heavy weight steel, which has twice the thickness of typical steel or galvanized steel; in addition, when steel or galvanized steel pipe is used, the amount of the base material is reduced dramatically during the thread-cutting process, resulting in a loss of strength in the pipe and its ability to resist corrosion over time. Thus, Craven was of the opinion that the failure to use the correct pipe and the lack of adequate thread depth on the riser, "when subjected to the water hammer nozzle reaction caused the separation of the riser."

Relying upon Craven's declaration, plaintiffs asserted that the following nine material facts relating to product defect and causation were in dispute:

(1) whether the deck gun was defective in that it was manufactured and sold without adequate warnings of proper maintenance of the gun and its attachments; (2) whether the gun was defective in that it was manufactured and sold without adequate warnings concerning proper mounting of the deck gun; (3) whether the deck gun was defective in that it was not designed with a flange mounting system; (4) whether the incident giving rise to this action was caused by conditions that generated a nozzle reaction and a high level of water pressure, that in turn caused the riser attachment to the deck gun to separate from the fire truck mounting; (5) whether the riser separated as a result of the combination of the presence of corrosion on the riser, inadequate depth engagement on the riser pipe, and improper pipe materials; (6) whether the incident would have occurred had the deck gun been designed with a flange mounting system or had adequate warnings about use of such a system been given; (7) whether the incident would have occurred had the riser been regularly inspected for corrosion; (8) whether it was foreseeable to a supplier of fire apparatus parts that steel components have a tendency to rust and corrode through normal use and can result in failure of attachments, including risers; and (9) whether it is foreseeable to a supplier of fire apparatus parts that conditions may exist during firefighting operations that cause a water hammer effect to occur.

After hearing on the summary judgment motion, the court issued an order granting the motion. The order stated in pertinent part: "[T]he moving [parties are] entitled to summary judgment as a matter of law for the following reasons. There is no triable issue of fact regarding whether or not the deck gun is defective. There is no evidence provided that the deck gun was defective. The piece of pipe that disengaged was not part of the deck gun and was requested and installed by another party. The court finds that there is no duty to warn regarding a 17 year old component part that was not defective. The court further finds that the plaintiffs' expert declaration did not provide sufficient evidence to overcome the holding in *Union Bank* v. *Superior Court* (1995) 31 Cal.App.4th 573 [37 Cal.Rptr.2d 653]."[3]

Plaintiffs filed timely notice of appeal from the judgment.

---

[3]The trial court's reference to the *Union Bank* case is puzzling, inasmuch as that case simply held that the 1992 and 1993 amendments to the summary judgment law intended to abrogate a Court of Appeal decision prohibiting moving defendants from securing a summary judgment based upon factually inadequate discovery responses of a plaintiff, and that the defendant therein was entitled to summary judgment on a fraud claim because "plaintiffs' interrogatory responses demonstrate they have no evidence defendant made any fraudulent representations; plaintiffs' interrogatory responses indicate they have no evidence defendant was a member of a fraudulent conspiracy; and plaintiffs admitted defendant had done nothing wrong in connection with the actual lending of the money . . . ." (*Union Bank* v. *Superior Court* (1995) 31 Cal.App.4th 573, 592-593 [37 Cal.Rptr.2d 653].) There was no indication in

# I

## *Summary Judgment Principles*

" 'Summary judgment is appropriate only if the evidence shows there is no triable issue of any material fact, and that the moving party is entitled to judgment as a matter of law. The trial court's obligation in ruling on a summary judgment motion is to determine whether issues of fact exist, not to decide the merits of the issues themselves. When making that determination, the trial court must strictly construe the affidavits of the moving party, and liberally construe those of the opponent. . . .' [Citation.] [¶] . . . We independently review the record to determine whether the moving party is entitled to judgment as a matter of law." (*Schwoerer* v. *Union Oil Co.* (1993) 14 Cal.App.4th 103, 110 [17 Cal.Rptr.2d 227].) "If a plaintiff pleads several theories, the defendant has the burden of demonstrating there are no material facts requiring trial on any of them. 'The moving defendant whose declarations omit facts as to any such theory . . . permits that portion of the complaint to be unchallenged.' " (*Hufft* v. *Horowitz* (1992) 4 Cal.App.4th 8, 13 [5 Cal.Rptr.2d 377].) Thus, even if no opposition is presented, the moving party still has the burden of eliminating all triable issues of fact. (*Ibid.*)

In the instant case, the cause of action for strict products liability alleges that the deck gun was "defectively designed, manufactured, assembled, labeled, distributed, advertised, marketed, sold, inspected, tested, or maintained." Thus, the pleading is broad enough to allege all three theories of product defect. There are commonly three types of product defects. "First, there may be a flaw in the manufacturing process, resulting in a product that differs from the manufacturer's intended result. . . . [¶] Second, there are products which are 'perfectly' manufactured but are unsafe because of the absence of a safety device, i.e., a defect in design. . . . [¶] The third type of defect . . . is a product that is dangerous because it lacks adequate warnings or instructions." (*Brown* v. *Superior Court* (1988) 44 Cal.3d 1049, 1057 [245 Cal.Rptr. 412, 751 P.2d 470].) "This doctrine of strict liability extends to products which have design defects, manufacturing

---

the summary judgment motion that Stang was relying upon factually inadequate discovery responses of plaintiffs to show that plaintiffs had no evidence to support their case.

To the extent the court was referring to the plaintiffs' apparently mistaken response of "undisputed" to a portion of one of defendants' separate statements of fact dealing with the issue of causation, we conclude that no authority is provided in *Union Bank* which would allow such an ambiguous and mistaken response to be interpreted to be a "judicial admission" or an admission, when such response was not under oath or part of any pleading, and when the response was inconsistent with other responses and evidence submitted in opposition to the summary judgment motion. (See fn. 2, *ante.*)

defects, or 'warning defects.'" (*Sparks* v. *Owens-Illinois, Inc.* (1995) 32 Cal.App.4th 461, 472 [38 Cal.Rptr.2d 739].)

 Respondents argue that because the deck gun did not "fail,"— which we interpret to mean that it did not break, or suffer any damage, during Skip Wright's accident—it was not a defective product within the meaning of strict products liability law. Appellants agreed it was undisputed that the deck gun did not "fail," and that the pipe remained attached to the gun during the accident, and the pipe did not shear at the point it was connected with the deck gun. However, respondents cite no authority for their implied proposition that when a product causes personal injuries it is not defective merely because the product itself remains intact or is not damaged in an accident. Further, no explanation or evidence was offered by respondents to link the fact that the deck gun itself did not break with the alleged theories of design defect and "warning defects," which appear to be the product defects upon which appellants are basing their action.

One of the theories of liability suggested by appellants, and supported by Craven's declaration, is that the deck gun was defective in design because it was not designed with a flange mounting system. Appellants in their opening brief appear to concede the fact that the deck gun was manufactured in accordance with the requests of the Glendale Fire Department, although there was no evidence on the issue either way offered by the parties below. We thus cannot determine whether the deck gun in question was mass produced, or a special piece of equipment made in accordance with the purchaser's plans. In any event, the uniqueness of a purchaser's order does not alter the manufacturer's responsibilities and is not a defense. (See *DeLeon* v. *Commercial Manufacturing & Supply Co.* (1983) 148 Cal.App.3d 336, 346-347 [195 Cal.Rptr. 867].) It is unclear from appellants' brief whether appellants are asserting the design defect theory as a separate theory of liability, or in connection with the warning defect theory of liability, which appears to be the primary focus of the parties' briefs. To the extent that appellants are asserting a design defect theory of strict products liability, we conclude that the instant motion for summary judgment should have been denied because the instant record presents triable issues of fact on the issue of whether or not the deck gun was defectively designed in that it was not manufactured with a flange mounting system or the capability to have such a system attached to the deck gun. We also note that in their moving papers below, Stang failed to cite any authority on the issue of the manufacturer's liability even assuming that the Glendale Fire Department specified that it intended to use the threaded pipe attachment instead of a flange mounting system, which the parties admitted was available for use by the fire department. In other words, Stang failed to provide sufficient authority or evidence to negate the design defect theory of product defect.

We now turn to the focus of the parties' briefs, the "warning defect" theory of product defect.

## II

### Product Defect Based on Inadequate Warnings or Instructions[4]

■ Under 'warning defect' strict liability, a product, even though faultlessly made, is defective if it is 'unreasonably dangerous to place . . . in the hands of a user without a suitable warning and the product is supplied and no warning is given.' [Citation.] It is now settled that 'knowledge or knowability [of the danger] is a component of strict liability for failure to warn.' (*Anderson* v. *Owens-Corning Fiberglas Corp.* (1991) 53 Cal.3d 987, 1000 . . . .)" (*Hufft* v. *Horowitz, supra,* 4 Cal.App.4th at p. 13.) "This does not require the manufacturer to warn against every conceivable health problem associated with use of a product. However, the more severe the consequences from unprotected exposure, the greater the need to warn of significant health risks. '[I]t is necessary to weigh the degree of danger involved when determining whether a warning defect exists.' [Citations.] '[T]he adequacy of the warning must be commensurate with the risk of harm and level of potential of such harm . . . .' " (*Schwoerer* v. *Union Oil Co., supra,* 14 Cal.App.4th at p. 112.)

■ "Negligence law in a failure-to-warn case requires a plaintiff to prove that a manufacturer or distributor did not warn of a particular risk for reasons which fell below the acceptable standard of care, i.e., what a reasonably prudent manufacturer would have known and warned about. Strict liability is not concerned with the standard of due care or the reasonableness of a manufacturer's conduct. The rules of strict liability require a plaintiff to prove only that the defendant did not adequately warn of a particular risk that was known or knowable in light of the generally recognized and prevailing best scientific and medical knowledge available at the time of manufacture and distribution. Thus, in strict liability, as opposed to

---

[4]Respondents incorrectly contend that there is no evidence in the record that there were no warnings, and that the "warning defect" issue is not properly before us because appellants failed to establish the product lacked a warning. Inasmuch as Stang were the parties moving for summary judgment, they had the burden to negate all theories of liability reflected in the complaint. If there were indeed warnings or instructions given with respect to the deck gun, it was up to Stang to provide evidence of such. They did not do so. On the other hand, Craven's declaration provides evidence that "Stang did not provide any of the aforementioned warnings [regarding the potential hazards of a water hammer and nozzle reaction, the need for proper inspection and maintenance, and the use of a flange mounting system or attachments made of industrial heavy steel]."

Thus, there is indeed evidence in our record that Stang did not provide the foregoing warnings with respect to the deck gun.

negligence, the reasonableness of the defendant's failure to warn is immaterial." (*Anderson* v. *Owens-Corning Fiberglas Corp.* (1991) 53 Cal.3d 987, 1002-1003 [281 Cal.Rptr. 528, 810 P.2d 549], fn. omitted.)

In this case, Stang did not claim below, nor do they contend on appeal, that a "water hammer," nozzle reaction, and corrosion are unknown or unknowable risks associated with the use of a deck gun. ■ Therefore, "Whether a warning is adequate depends on several factors, among them 'the normal expectations of the consumer as to how a product will perform, degrees of simplicity or complication in its operation or use, the nature and magnitude of the danger to which the user is exposed, the likelihood of injury, and the feasibility and beneficial effect of including a warning.'" (*Schwoerer* v. *Union Oil Co.*, *supra*, 14 Cal.App.4th 103, 111.)

■ Respondents argue that "The duty to warn does not include the duty to warn of known dangers foreseeable to the user." They claim that Craven's declaration establishes that it is foreseeable to anyone familiar with fire apparatus, including Skip Wright, allegedly a firefighter for 13 years, that water hammer nozzle reactions can occur and that this, in combination with corrosion, can result in the failure of attachments to the deck gun. Respondents fail to cite any evidence that Wright was aware of any of the dangers of separation due to the design features of the deck gun and attachments as noted by Craven. Although Wright may have been aware of the water hammer effect in general, there is no evidence that he was aware that he was using a product which had the problems or defects noted by Craven, or that he may have been subjecting himself to the risk of injury in using the deck gun with the riser pipe attachment. Respondents' reliance on 6 Witkin, Summary of California Law (9th ed. 1988) Torts, section 1265, page 707, and on *Bojorquez* v. *House of Toys, Inc.* (1976) 62 Cal.App.3d 930 [133 Cal.Rptr. 483, 95 A.L.R.3d 386], does not support their claim that the manufacturer herein is not subject to "warning defect" principles of strict product liability on the ground that the danger, or potential danger of the deck gun is generally known and recognized. The product in *Bojorquez* was a slingshot, and the court's only discussion of this issue was as follows: "Is the potential danger of a slingshot generally known? Ever since David slew Goliath young and old alike have known that slingshots can be dangerous and deadly. [Citation.] There is no need to include a warning; the product is not defective because it lacked a warning; there is no cause of action in strict liability." (62 Cal.App.3d at p. 934.) Inasmuch as respondents fail to establish that the dangers or potential dangers of the deck gun and the nature of its use and operation are matters "generally known," or even actually known by Skip Wright herein, we conclude that the foregoing authorities are inapposite.

Moreover, we question whether any conduct by Wright in voluntarily and unreasonably encountering a known risk would provide a complete defense to respondents unless respondents meet the test for primary assumption of the risk set out in *Knight* v. *Jewett* (1992) 3 Cal.4th 296 [11 Cal.Rptr.2d 2, 834 P.2d 696]. In a pre-*Knight* case of *Gonzales* v. *Carmenita Ford Truck Sales, Inc.* (1987) 192 Cal.App.3d 1143 [238 Cal.Rptr. 18], the court stated that "Strict liability for failure to warn does not attach if the dangerous propensity is either obvious or known to the injured person at the time the product is used." (*Id.* at p. 1151-1152.) However, the court in *Gonzales* continued to explain that such knowledge of danger by the user "would not preclude an instruction on strict liability for failure to warn. It would merely give rise to a potential defense in Carmenita [the manufacturer] if Gonzales 'voluntarily and unreasonably proceed[ed] to encounter a known danger, more commonly referred to as assumption of the risk.' " (*Id.* at p. 1152.)

In *Milwaukee Electric Tool Corp.* v. *Superior Court* (1993) 15 Cal.App.4th 547 [19 Cal.Rptr.2d 24], the plaintiff worker, a glazier, was injured by a heavy-duty, variable-speed drill manufactured by defendant, and the manufacturer moved for summary adjudication on the ground that its affirmative defense of reasonable implied assumption of the risk barred plaintiff's claims for strict products liability and breach of warranty. The trial court denied the manufacturer's motion and the Court of Appeal denied the manufacturer's petition for writ of mandate on the ground that the manufacturer failed to show the absence of any duty of care to plaintiff under the doctrine of primary assumption of risk set out in *Knight* v. *Jewett, supra,* 3 Cal.4th 296.

In examining the two elements of the test for application of primary assumption of the risk—the nature of the activity in which defendant is engaged, and the relationship between the defendant and the plaintiff to that activity—the court in *Milwaukee Electric Tool Corp.* stated as to the first factor: "We find nothing in the nature of the manufacturing activity to indicate that a finding of no duty on the manufacturer's part should be made. To the contrary, we believe there is a sound basis in the development of strict products liability doctrine to support analysis of a products liability case, even one involving an assertion of assumption of the risk, in terms of a duty on the part of the manufacturer to produce defect-free products." (15 Cal.App.4th at p. 562.) Moreover, in addressing the second factor, the court stated: "[W]e do not find that an injury claimed to have been caused by a dangerously defective power tool is 'a risk that is inherent' in a worker's job. [Citation.] In the relationship of the defendant and the plaintiff to the activity, the use of the tool, it cannot be said that the plaintiff user undertook to act as a product tester or guinea pig. In other words, those defendants in

primary assumption of the risk cases who have been found not to owe any duty to an injured plaintiff . . . are in a different position than is a manufacturer of a tool which ultimately causes injury to its user, because the user was not necessarily a professional employed to confront the very danger posed by the injury-causing agent. In short, we are not persuaded that the reasons supporting the firefighter's rule indicate that primary assumption of the risk also exists in the strict products liability context." (15 Cal.App.4th at pp. 562-563.)

"According to [*Knight* v. *Jewett, supra*, 3 Cal.4th 296], once it is found that a defendant owes a duty to a particular plaintiff, secondary assumption of the risk theory is merged into comparative fault. . . . [¶] . . . [¶] Accordingly, where the defendant manufacturer does owe a duty of care to the plaintiff, 'but the plaintiff proceeds to encounter a known risk imposed by the defendant's breach of duty' [citation], assumption of the risk is merged into the comparative fault scheme so that a trier of fact may consider the relative responsibility of the parties in apportioning the loss and damage resulting from the injury." (*Milwaukee Electric Tool Corp.* v. *Superior Court, supra*, 15 Cal.App.4th at p. 565.) Where a case is subject to comparative fault principles, it is inappropriate for summary judgment. (*Id.* at p. 566.)

We find *Milwaukee Electric Tool Corp.* persuasive here, and conclude that respondents failed to establish primary assumption of the risk as a bar to appellants' cause of action for strict products liability. Accordingly, the trial court erred in finding there was "no duty to warn regarding a 17 year old component part . . . ."[5] Further, assuming without deciding that the case is subject to comparative fault principles, summary judgment still would have been inappropriate. Inasmuch as respondents have failed to establish that primary assumption of the risk bars appellants' claim for strict products liability, we proceed to address respondents' contention that as a component part manufacturer it is not liable for a failure to warn when the final product is subsequently packaged, labeled and marketed by another manufacturer.

To support their claim that they are not liable as component part manufacturers, respondents rely upon *Walker* v. *Stauffer Chemical Corp.* (1971) 19 Cal.App.3d 669 [96 Cal.Rptr. 803], and *Lee* v. *Electric Motor Division* (1985) 169 Cal.App.3d 375 [215 Cal.Rptr. 195]. *Walker* is factually distinguishable from the instant case and does not support the summary judgment herein. In *Walker*, the plaintiff was a tenant in a building owned by defendant Mueller, who supplied her with a drain-cleaning product known as

---

[5]In this aspect of its order, the court appears to confuse the theory of successor liability under *Ray* v. *Alad Corp, supra*, 19 Cal.3d 22, which provides one of the underpinnings for the instant complaint against respondents, with other theories of liability based on respondents' own independent negligence or breach of warranty.

Clear-All; Stauffer supplied bulk sulfuric acid to the manufacturer of Clear-All, Fazio; Clear-All contained 50 percent sulfuric acid and 50 percent alkaline base. The court found no authority extending strict product liability to the "supplier of a substance to be used in compounding or formulating the product which eventually causes injury to an ultimate consumer. . . . [¶] . . . We do not believe it realistically feasible or necessary to the protection of the public to require the manufacturer and supplier of a standard chemical ingredient such as bulk sulfuric acid, not having control over the subsequent compounding, packaging or marketing of an item eventually causing injury to the ultimate consumer, to bear the responsibility for that injury. The manufacturer (seller) of the product causing the injury is so situated as to afford the necessary protection." (19 Cal.App.3d at pp. 673-674.)

Unlike the situation in *Walker*, there is no evidence in this case that the deck gun was not intended to reach the ultimate consumer in the same condition as it left the manufacturer. *Walker* is not dispositive here.

We also conclude that *Lee* is not dispositive in the instant case. In *Lee,* the defendant manufactured a component part, a motor, which was installed in a meat grinding machine which injured plaintiff; plaintiffs claimed that the motor was defective because it lacked a warning that it did not stop immediately when turned off. The court upheld summary judgment in favor of defendant, stating that ". . . there is nothing to indicate that the motor in its use had unreasonably dangerous propensities not ordinarily discoverable by the user. The uncontradicted evidence shows that all motors, even 'brake motors,' do not stop immediately. There is no danger in the motor which would not have been obvious to a person of ordinary intelligence. [¶] Moreover, we stress that defendant gave no input and had no control over the design, manufacture, and packaging of the finished product. The cases relied on by defendant demonstrate a reluctance against imposing liability for the component-part manufacturer's failure to warn the consumer where the final product is subsequently packaged, labeled and marketed by another manufacturer. [Citations.] [¶] . . . [¶] Accordingly, we conclude that defendant owed no duty to plaintiffs to warn that the motor did not stop immediately." (169 Cal.App.3d at pp. 388-389, fn. omitted.)

In light of *Knight* v. *Jewett* and *Milwaukee Electric Tool Corp.*, discussed above, we question *Lee*'s analysis of the "duty" issue for purposes of determining liability under strict products liability principles. We also fail to see how the deck gun was "packaged, labeled, and marketed," by the Glendale Fire Department; rather, the fire department apparently installed it on their firetruck without making any changes to the deck gun or firetruck. It is also *not negated* on our record that the manufacturer knew that the fire

department intended to attach the deck gun to a threaded riser pipe. Accordingly, the instant case presents different issues than those discussed in *Lee*.

We find the circumstances in the instant case more similar to those in *Huynh* v. *Ingersoll-Rand* (1993) 16 Cal.App.4th 825 [20 Cal.Rptr.2d 296], where a worker suffered an eye injury when a hand-held power grinder with a "mismatched" disc, which did not meet the specified revolutions per minute, exploded; plaintiff alleged that the manufacturer's warning was not adequate in that it did not foresee the "misuse" of the grinder by attaching the wrong disc, and provide an adequate warning. The defendant predicated its summary judgment motion on the ground that the plaintiff "misused" the grinder by coupling it with a disc not rated to handle the higher speeds at which the grinder was capable of running. The Court of Appeal reversed the summary judgment, finding that several triable issues remained on the affirmative defense of misuse.

" 'Misuse' is a defense only when that misuse is the actual cause of the plaintiff's injury, not when some other defect produces the harm." (*Huynh* v. *Ingersoll-Rand*, *supra*, 16 Cal.App.4th at p. 831.) "Huynh responded to Ingersoll's assertion of the affirmative defense of 'misuse' of the grinder by contending this was a foreseeable 'misuse' of Ingersoll's product. Since it was a foreseeable 'misuse'—actually a foreseeable danger in how the product could be used—Huynh argued Ingersoll remains liable unless it provides an *adequate* warning. [¶] This position accurately reflects the current state of the law. '[T]he law now requires a manufacturer to foresee some degree of misuse and abuse of his product, either by the user or by third parties, and to take reasonable precautions to minimize the harm that may result from misuse and abuse.' [Citation.] '[T]he extent to which designers and manufacturers of dangerous machinery are required to anticipate safety neglect presents an issue of fact.' [Citation.] '[A] manufacturer owes a foreseeable user of its product a duty to warn of risks of using the product.' [Citation.] As [*Self* v. *General Motors Corp.* (1974) 42 Cal.App.3d 1 (116 Cal.Rptr. 575)] and [*Balido* v. *Improved Machinery, Inc.* (1973) 29 Cal.App.3d 633, 645 (105 Cal.Rptr. 890)] make clear the risks which must be warned against obviously include foreseeable dangerous 'misuses' of the product, such as attaching an inappropriate grinding disc to the grinder." (16 Cal.App.4th at p. 833.)

The court in *Huynh* went on to state that "A manufacturer does not satisfy its duty to warn by supplying a warning so vague and ambiguous only some users are likely to read and comprehend the danger. It cannot count on the sophisticated users—even those in an employment setting—passing on to the less sophisticated the fact the obtuse language the manufacturer included

actually constitutes a warning against certain uses of the product." (16 Cal.App.4th at p. 834.)

 As in *Huyhn,* we conclude that respondents failed to counter Craven's declaration, or to otherwise negate appellants' allegations that the manufacturer of the deck gun did not provide an adequate, or any, warning against the potential dangerous and foreseeable "mismatch" of the deck gun and riser pipe attachments which did not have adequate strength or design to withstand the water pressures generated with the use of the deck gun, and the alleged foreseeable danger that the deck gun or its attachments may become separated from the fire truck under such pressures. We thus conclude that triable issues of fact exist on the "warning defect" aspect of strict products liability.

Finally, we note that since the summary judgment motion admittedly did not address or negate successor liability under *Alad,* the motion should have been denied, whether or not any showing was made as to liability based on respondents' own conduct or involvement with the manufacture or distribution of the deck gun. Thus, respondents' citation to *Gee* v. *Tenneco, Inc.* (9th Cir. 1980) 615 F.2d 857 is inapposite, as that case discussed the issue of the duty to warn of the dangers of a chemical used as a dye for X-ray purposes only as an *independent duty* of a corporation with knowledge of the potential dangers of the chemical, apart from its liability purely as a successor of the manufacturer. (*Id.* at p. 865.) We need not address the former issue here because we have found triable issues of fact to exist assuming that respondents are successors of the manufacturer of the deck gun, and respondents failed to negate their status as successors liable under *Alad.* Respondents also failed to move for summary adjudication of issues to highlight or focus on other theories of liability which may be at issue in this case.

### DISPOSITION

The judgment is reversed, and on remand, the trial court is directed to deny respondents' motion for summary judgment. Appellants are entitled to costs on appeal.

Johnson, J., and Woods, J., concurred.

Respondents' petition for review by the Supreme Court was denied August 13, 1997.